JENNINGS v SOUTHWOOD

BORODITSCH v COMMUNITY EMERGENCY
MEDICAL SERVICE, INC

Docket Nos. 96277, 96330. Argued March 9, 1994 (Calendar Nos. 6-7).
Decided August 2, 1994.

Dean S. Jennings, as conservator of the estate of Cynthia K.
Rasmussen, a minor, brought an action in the Berrien Circuit
Court against Richard J. Southwood and other emergency
services personnel and Lake Township and Lake Township
Ambulance Rescue, alleging that refusal by the EMS personnel
to transport Cynthia to the hospital resulted in her slipping
into a continuing diabetic coma. The court, John T. Hammond,
J., dismissed the municipality, holding that it could not be held
vicariously liable on the ground of governmental immunity,
and thereafter entered judgment on a jury verdict for the
defendants. The Court of Appeals, GRIFFIN, P.J., and NEFF and
CORRIGAN, JJ., affirmed in an opinion per curiam, finding that
the plaintiffs failed to demonstrate gross negligence as defined
in *Gibbard v Cursan,* 225 Mich 311 (1923), thereby rendering
the defendants immune from suit under the emergency medical
services act. It also concluded that although the trial court
erred in using criminal examples of gross negligence and
dismissing the municipality, the errors were harmless in light
of the plaintiffs' failure to plead and prove gross negligence
(Docket No. 119614). The parties appeal.

Valentina E. Boroditsch, as personal representative of the estate
of Fedor Boroditsch, deceased, brought an action in the Oak-
land Circuit Court against Community Emergency Medical
Service, Inc., alleging that in attempting to provide an airway
for Mr. Boroditsch, an advanced emergency medical technician
erroneously inserted an endotracheal tube into the decedent's
esophagus instead of his trachea, resulting in oxygen being

REFERENCES

Am Jur 2d, Negligence §§ 243, 247, 248, 250, 273, 276, 290-292.
Liability for negligence of ambulance attendants, emergency medi-
cal technicians, and the like, rendering emergency medical care
outside hospital. 16 ALR5th 605.

pushed into his stomach rather than his lungs and thereby preventing any possibility of normal breathing. In an amended complaint, the plaintiff further alleged gross negligence and wilful misconduct. The court, Robert L. Templin, J., granted summary disposition for the defendant because of the plaintiff's failure to show gross negligence under *Gibbard* and, in the alternative, because the plaintiff had not alleged such an indifference to whether harm would result as to be the equivalent of a willingness that it did result. The Court of Appeals, MURPHY, P.J., and MICHAEL J. KELLY and WAHLS, JJ., affirmed in an unpublished opinion per curiam (Docket No. 134371). The plaintiff appeals.

In an opinion by Chief Justice CAVANAGH, joined by Justices LEVIN, BRICKLEY, RILEY, GRIFFIN, and MALLETT, the Supreme Court *held:*

The emergency medical services act, while immunizing emergency medical service personnel from liability for ordinary negligence, permits such personnel to be held liable for acts of gross negligence, i.e., conduct so reckless as to demonstrate a substantial lack of concern for whether an injury will result. The act also permits recovery for acts of wilful misconduct, and a plaintiff alleging wilful misconduct must allege that the actor intended harm.

1. Under *Gibbard,* the common-law definition of gross negligence did not amount to a high degree or level of negligence, but was merely ordinary negligence of the defendant that followed the negligence of the plaintiff. The rule of *Gibbard* was fashioned to circumvent the harsh consequences of contributory negligence. With the abandonment of contributory negligence and the adoption of comparative negligence, the justification for the *Gibbard* definition and its attendant legal theories was eliminated.

2. In enacting the emergency medical services act, the Legislature sought to provide uniform regulation of emergency medical services and to limit exposure to liability of emergency personnel for ordinary negligence. The gross negligence definition of *Gibbard* is contrary to this intent, and adherence to it additionally would discourage citizens from entering the EMS profession. Although the emergency medical services act does not define gross negligence, a definition is provided in the government tort liability act, which shares the common purpose of immunizing certain government agents from ordinary negligence and permitting liability for gross negligence. Under the government tort liability act, gross negligence is conduct so reckless as to demonstrate a substantial lack of concern for

whether an injury will result. Read in pari materia, the definition of gross negligence in the tort liability act appropriately provides the standard for the emergency medical services act.

3. The emergency medical services act also permits recovery for acts of "wilful" misconduct. However, the *Gibbard* standard for "wilful and wanton" misconduct may not be applied to decide allegations of wilful misconduct under the act. "Wilful" requires a finding of an actual intent to harm, while "wanton" requires an inference of intent drawn from reckless conduct. To require a showing of both states of mind would defy logic and be internally inconsistent. Thus, to allege wilful misconduct under the emergency medical services act, a plaintiff must allege that the actor intended harm.

4. In *Boroditsch,* because the trial court, in granting the defendant's motion for summary disposition pursuant to MCR 2.116(C)(8) on the ground that the plaintiff failed to make a showing of gross negligence under *Gibbard,* did not have an opportunity to decide the motion under the proper standard, its order must be vacated, and the case remanded for further proceedings. However, because a review of the pleadings reveals that the plaintiff did not allege that the EMS personnel intended to harm the plaintiff's decedent and that the trial court's determination necessarily included review under the "wilful" standard, summary disposition for the defendant under MCR 2.116(C)(8) on the ground that the plaintiff failed to allege wilful and wanton misconduct was appropriate.

5. In *Jennings,* the dismissal of the municipality on grounds of governmental immunity was erroneous. However, the determination by the Court of Appeals that that error and the use by the trial court of criminal examples in its instructions regarding gross negligence were harmless because the plaintiff failed to prove gross negligence under the *Gibbard* standard requires vacation of the judgment of the Court of Appeals and remand to that Court for further proceedings.

Justice BOYLE concurred only in the result.

*Jennings,* vacated and remanded.

*Boroditsch,* vacated in part.

198 Mich App 713; 499 NW2d 460 (1993) vacated.

1. GOVERNMENTAL IMMUNITY — EMERGENCY MEDICAL SERVICES ACT
    — GROSS NEGLIGENCE.

For purposes of the emergency medical services act, "gross negligence" is defined as conduct so reckless as to demonstrate a substantial lack of concern for whether an injury will result (MCL 333.20737; MSA 14.15[20737], repealed and replaced by MCL 333.20965; MSA 14.15[20965]; MCL 691.1407[2][c]; MSA 3.996[107][2][c]).

2. Governmental Immunity — Emergency Medical Services Act
   — Wilful Misconduct.
      A plaintiff alleging wilful misconduct under the emergency medi-
      cal services act must allege that the actor intended harm (MCL
      333.20737; MSA 14.15[20737], repealed and replaced by MCL
      333.20965; MSA 14.15[20965]; MCL 691.1407[2][c]; MSA
      3.996[107][2][c]).

*Michael D. Marrs, P.C.* (by *Michael D. Marrs*),
for the plaintiff in *Jennings.*

*Sachs, Waldman, O'Hare, Helveston, Hodges &
Barnes, P.C.* (by *David K. Barnes, Jr., Ronald S.
Weiner, Elizabeth A. Cabot,* and *Kathleen L.
Bogas*), for the plaintiff in *Boroditsch.*

*Cummings, McClorey, Davis & Acho, P.C.* (by
*Marcia L. Howe*), for the defendants in *Jennings.*

*Highland & Zanetti, P.C.* (by *Mark C. Lahti* and
*J. R. Zanetti, Jr.*), for the defendant in *Boroditsch.*

CAVANAGH, C.J. Our task in these consolidated
cases is to determine whether the common-law
definitions of gross negligence and wilful and wan-
ton misconduct remain viable against the back-
drop of the emergency medical services act (EMSA).[1]

[1] The EMSA, in effect at the time of the alleged wrongs, MCL
333.20701 *et seq.*; MSA 14.15(20701) *et seq.*, controls the disposition of
these cases. The statute was changed slightly by 1990 PA 179, and it
is presently found at MCL 333.20901 *et seq.*; MSA 14.15(20901) *et seq.*
However, both versions impose liability for acts or omissions consti-
tuting "gross negligence or wilful misconduct." Compare former MCL
333.20737; MSA 14.15(20737) with MCL 333.20965(1); MSA
14.15(20965)(1):

   Unless an act or omission is the result of gross negligence or
   willful misconduct, the acts or omissions of a medical first
   responder, emergency medical technician, emergency medical
   technician specialist, paramedic, or medical director of a medi-
   cal control authority or his or her designee while providing
   services to a patient outside a hospital, or in a hospital before
   transferring patient care to hospital personnel, that are consis-
   tent with the individual's licensure or additional training re-

## I. GROSS NEGLIGENCE

### A

This Court stated the common-law definition of gross negligence in *Gibbard v Cursan,* 225 Mich 311; 196 NW 398 (1923). In *Gibbard,* the defendant's truck struck the plaintiff's decedent. The evidence revealed that the decedent ran into the path of the defendant's truck after the defendant sounded his horn. At the time we decided *Gibbard,* Michigan followed the rule that the plaintiff's contributory negligence barred the plaintiff's recovery.[2] The *Gibbard* Court fashioned the rule of gross negligence to circumvent the harsh rule of contributory negligence. "It is to avoid this rule and to excuse contributory negligence of a plaintiff that the doctrine of gross negligence is usually invoked." *Id.* at 319. With this goal in mind, the *Gibbard* Court defined gross negligence:

In a case where the defendant, who knows, or ought, by the exercise of ordinary care, to know, of the *precedent negligence* of the plaintiff, by his *subsequent negligence* does plaintiff an injury. Strictly, this is the basis of recovery in all cases of gross negligence. 20 RCL, p 145. Such gross negligence is also sometimes called discovered negli-

---

quired by the local medical control authority do not impose liability in the treatment of a patient on those individuals . . . .

[2] The concept of contributory negligence found acceptance in our state's jurisprudence as early as 1851:

It is a well settled principle of law, that where an injury, of which a plaintiff complains, has resulted from the fault or negligence of himself, or where it has resulted from the fault or negligence of both parties, without any intentional wrong on the part of the defendant, an action cannot be maintained. [*Williams v Michigan C R Co,* 2 Mich 259, 265 (1851).]

gence, subsequent negligence, wanton or wilful or reckless negligence, discovered peril, last clear chance doctrine, and the humanitarian rule.

\* \* \*

If the plaintiff is in a position which has become dangerous and he is free from negligence, and the defendant knows, or ought by the exercise of ordinary care to know, of plaintiff's peril, and nevertheless negligently injures him, there is no occasion to invoke the doctrine of gross negligence to excuse negligence of plaintiff, for there is no negligence of plaintiff to be excused. [*Id.* at 319-320. Emphasis in original.]

Gross negligence, as defined in *Gibbard,* is not a high-degree or level of negligence. On the contrary, it is merely ordinary negligence of the defendant that follows the negligence of the plaintiff.[3] The *Gibbard* definition has continued to hold a place in Michigan law despite this Court's rejection of the practices that compelled its creation.

B

The *Gibbard* definition of gross negligence was designed to avoid the harsh consequences that often resulted from this jurisdiction's adherence to the bar of contributory negligence. This Court has since, however, abandoned the doctrine of contributory negligence, *Placek v Sterling Heights,* 405 Mich 638, 650; 275 NW2d 511 (1979), eliminating the justification for the *Gibbard* definition. This Court's adoption of pure comparative negligence, in lieu of contributory negligence, eliminates the very imperfection the *Gibbard* Court sought to circumvent—it avoids unfair and unjust results.

---

[3] Nor can it be said that because a defendant's negligence is great, of a comparative or superlative degree, it may therefore be called "gross" . . . . [*Id.* at 320.]

Under pure comparative negligence, a plaintiff's negligence does not bar the plaintiff's recovery; instead, it reduces the amount of the plaintiff's recovery, allocating liability in proportion to fault. See, generally, *id.* at 652-656, and *Kirby v Larson,* 400 Mich 585, 613-629; 256 NW2d 400 (1977) (opinion of WILLIAMS, J.). With the elimination of the contributory negligence bar, the desirability of the *Gibbard's* gross negligence is greatly lessened.

Following our elimination of the contributory negligence rule, we have rejected the doctrines that held a place in our jurisprudence only because of our adherence to that rule. The demise of contributory negligence compelled our rejection of the doctrine of last clear chance. *Petrove v Grand Trunk W R Co,* 437 Mich 31, 33; 464 NW2d 711 (1991). When rejecting the doctrine, we adopted as our own the analysis of *Callesen v Grand Trunk W R Co,* 175 Mich App 252, 259-263; 437 NW2d 372 (1989). *Petrove* at 33. The *Callesen* panel reasoned that in the absence of the harsh "all or nothing" contributory negligence bar, the doctrine was rendered obsolete:

"[I]t is recognized by nearly all who have reflected upon the subject that the last clear chance doctrine is, in the final analysis, merely a means of ameliorating the harshness of the contributory negligence rule. Without the contributory negligence rule there would be no need for the palliative doctrine of last clear chance. To give continued life to that principle would defeat the very purpose of the comparative negligence rule—the apportionment of damages according to the degree of mutual fault. There is, therefore, no longer any reason for resort to the doctrine of last clear chance . . . ." [*Callesen* at 261 (quoting *Kaatz v State,* 540 P2d 1037, 1050 [Ala, 1975]).]

It is clear from the case of *Zeni v Anderson,* 397

Mich 117, 146-151; 243 NW2d 270 (1976), that *Gibbard's* "gross negligence" is merely an alternative label used to describe the doctrine of last clear chance.[4] "Such gross negligence is also sometimes called . . . last clear chance doctrine . . . ." *Gibbard* at 319.

*Gibbard's* formulation of gross negligence is really the doctrine of last clear chance in disguise; accordingly, its usefulness is dubious at best in light of our holding in *Petrove.*

While we recognize that *Gibbard's* gross negligence is a seventy-year-old doctrine, we must nevertheless discard it because it has outlived its usefulness. We do not take such action lightly, but we cannot continue to inflict on our citizenry a doctrine that makes little sense in today's jurisprudence. "We are out of step for no good reason and by these presents I would move to the cadenced music of the legal times." *Dearborn v Bacila,* 353 Mich 99, 113; 90 NW2d 863 (1958). Admittedly, adherence to precedent brings stability to the law, but when the precedent fails to serve the law, instead rendering the law its servant, we must sacrifice stability to fulfill our obligation.[5]

---

[4] Gross negligence, subsequent negligence, antecedent negligence, discovered negligence, discovered peril, last clear chance, intervening negligence, supervening negligence, humanitarian rule, are the same thing. . . . The number and variety of such designations, two at least inaccurate, another misleading, some not generally accepted, are deplorable. If, by common consent of bench and bar, this rule, now so variously named, might be known hereafter as last clear chance, the most popular designation, many difficulties of the student, of the practitioner, and of the judge, would be removed ultimately. [*Finkler v Zimmer,* 258 Mich 336, 340; 241 NW 851 (1932).]

[5] In the interest of justice, we have repudiated a number of doctrines:

For example, we abrogated the defense of assumption of risk,

This is an instance in which precedent fails to promote justice. We have repudiated the traditional justification for *Gibbard's* gross negligence. Contributory negligence no longer holds a place in Michigan jurisprudence, compelling the demise of its attendant legal theories. "The reasons for the old rule no longer obtaining, the rule falls with it." *Montgomery v Stephan,* 359 Mich 33, 49; 101 NW2d 227 (1960).

C

We would be remiss if we attempted to determine the continued viability of *Gibbard's* gross negligence, without an analysis of the EMSA and its purpose. Generally, when interpreting a statutory provision, we seek to effectuate the Legislature's intent. In the course of our analysis, we will avoid interpretations that produce absurd results. The Legislature enacted the EMSA in an effort to (1) provide for the uniform regulation of emergency medical services, and (2) limit emergency personnel's exposure to liability. *Malcolm v East Detroit,* 437 Mich 132, 142; 468 NW2d 479 (1991).

While *Gibbard's* gross negligence has little effect on the earlier objective, it affects the latter because it permits liability on a finding of ordinary

*Felgner v Anderson,* 375 Mich 23; 133 NW2d 136 (1965), repudiated the doctrine of imputed negligence, *Bricker v Green,* 313 Mich 218; 21 NW2d 105 (1946), eliminated the privity requirement in actions for breach of an implied warranty, *Spence v Three Rivers Builders & Masonry Supply, Inc,* 353 Mich 120; 90 NW2d 873 (1958), overruled the common-law disability prohibiting the wife from suing for the loss of her husband's consortium; *Montgomery v Stephan,* 359 Mich 33; 101 NW2d 227 (1960), overruled the common-law disallowance of recovery for negligently inflicted prenatal injury, *Womack v Buchhorn,* 384 Mich 718, 724-725; 187 NW2d 218 (1971); and even eliminated charitable immunity from negligence, *Parker v Port Huron Hosp,* 361 Mich 1; 105 NW2d 1 (1960). [*Kirby* at 625.]

negligence. Under *Gibbard's* gross negligence "the defendant is guilty of negligence—nothing else, and nothing more." *Finkler v Zimmer,* 258 Mich 336, 341; 241 NW 851 (1932). If emergency personnel are liable for ordinary negligence, then the EMSA immunity provision is rendered void. Before the statutory immunity, emergency personnel were liable for their ordinary negligence. The Legislature, dissatisfied with this situation, enacted the EMSA limiting liability to situations of gross negligence or wilful misconduct. Undoubtedly, by providing this limited immunity, the Legislature intended to shield emergency medical personnel from the very liability they were previously exposed to—liability for ordinary negligence.[6]

In a similar vein, by providing limited immunity, the Legislature sought to diminish an impediment that discouraged citizens from joining the EMS profession:

> [I]t is a comfort to current EMS field personnel that they at least have a statement of legislative support recognizing the difficulty inherent in their jobs. Removing the exemption could affect the morale of EMS workers or make them reluctant to perform certain parts of their jobs for fear of being sued, and could discourage persons from entering EMS occupations. [Senate Analysis Section, SB 159, First Analysis, April 14, 1981.][7]

---

[6] The preamble to the EMSA, as established in 1981, stated:

"An act to protect and promote the public health; to codify, revise, consolidate, classify, and add to the laws relating to public health; . . . to regulate occupations, facilities, and agencies affecting the public health; . . . *to provide certain immunity from liability* . . . ." [1981 PA 79. Emphasis added.]

Similarly, the preambles found in predecessor acts evidenced the intent to limit liability: (1) "to limit liability of certain medical personnel under certain conditions," 1976 PA 290, and (2) "to limit liability," 1974 PA 275.

[7] This analysis examined 1981 PA 79, the comprehensive emergency

We must give effect to the intent of the Legislature. "The cardinal rule of statutory construction is to ascertain and give effect to the intention of the legislature." *City of Lansing v Lansing Twp,* 356 Mich 641, 648; 97 NW2d 804 (1959). Imposition of *Gibbard's* gross negligence fails to promote participation in the EMS field—on the contrary—it discourages entry into the profession by permitting liability on a finding of ordinary negligence. *Gibbard's* gross negligence is thus contrary to the legislative intent of providing limited immunity.

Besides the rejection of the traditional justification for *Gibbard's* gross negligence, its failure to promote the intent of the Legislature in enacting the EMSA necessitates its demise. The EMSA seeks to insulate EMS personnel from liability to which they would otherwise be subjected. *Gibbard's* gross negligence fails to fulfill this purpose. Furthermore, our adherence to the *Gibbard* standard would discourage citizens from entering the EMS profession.

D

Having rejected *Gibbard's* standard of gross negligence, we are left with the task of adopting an appropriate definition of gross negligence. While most jurisdictions acknowledge that gross negligence falls somewhere between ordinary negligence and an intentional act, they fail to agree on

medical services act, the predecessor of the EMSA. Originally, 1981 PA 79 contemplated elimination of the limited immunity provided to EMS personnel. By the time of the Second Analysis, the proposed elimination was no longer a part of 1981 PA 79. See Senate Analysis Section, SB 159, Second Analysis, June 11, 1981. As a result, the Legislature never eliminated the limited immunity.

the exact definition.[8] This renders comparison of the various standards quite cumbersome and laborious. Fortunately, such a review is unnecessary because our Legislature has already declared what type of conduct constitutes gross negligence.

The government tort liability act, MCL 691.1401 *et seq.*; MSA 3.996(101) *et seq.* (GTLA), confers varying degrees of immunity to governments, their agencies, and their agents. Section 7[9] immunizes government employees and volunteers from tort liability for acts causing injury during the course of government service as long as the "conduct does not amount to gross negligence . . . ." Section 7 defines gross negligence as

> conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results.

Generally, when a statute fails to define an operative term, we define the term in accordance with the Legislature's intent. In enacting the EMSA, the Legislature intended to immunize EMS personnel from liability for ordinary negligence. Similarly, in enacting § 7 of the GTLA, the Legislature intended to immunize government agents from liability for ordinary negligence. The Legislature recognized the need to provide limited immunity to government agents as well as EMS personnel, as a means of encouraging participation in the respective fields. In this sense, the GTLA and the EMSA share the common purpose of immunizing certain agents from ordinary negligence and permitting liability for gross negligence. Because the provisions have a common purpose, the terms of the provisions should be read in pari materia.

---

[8] See, generally, 57A Am Jur 2d, Negligence, §§ 233-311; 3 Speiser, Krause & Gans, Torts, ch 10, pp 348-371.

[9] MCL 691.1407(2)(c); MSA 3.996(107)(2)(c).

"The object of the rule *in pari materia* is to carry into effect the purpose of the legislature as found in harmonious statutes on a subject." [*Wayne Co v Auditor General,* 250 Mich 227, 233; 229 NW 911 (1930).][10]

Because these provisions should be read in pari materia, we deem it appropriate to use the definition of gross negligence as found in § 7 of the GTLA, as the standard for gross negligence under the EMSA.

## II. WILFUL MISCONDUCT

### A

When determining whether conduct amounted to wilful misconduct under the EMSA, Michigan courts have applied the standard for wilful and wanton misconduct as explained in *Gibbard. Gibbard* described the required elements:

"(1) Knowledge of a situation requiring the exercise of ordinary care and diligence to avert injury to another; (2) ability to avoid the resulting harm by ordinary care and diligence in the use of the means at hand; (3) the omission to use such care and diligence to avert the threatened danger, when to the ordinary mind it must be apparent that the result is likely to prove disastrous to another." [*Id.* at 322.]

The Court acknowledged that a wilful act differed from a negligent act. "If one wilfully injures another, or if his conduct in doing the injury is so wanton or reckless that it amounts to the same thing, he is guilty of more than negligence. The

---

10 Incidentally, this well-accepted rule of statutory construction provides yet another justification for rejecting *Gibbard*'s definition of gross negligence.

act is characterized by wilfulness, rather than by inadvertence, it transcends negligence—is different in kind." *Id.* at 320.

While we acknowledged the need to clarify *Gibbard's* wilful and wanton misconduct, *Burnett v City of Adrian,* 414 Mich 448; 326 NW2d 810 (1982), we nevertheless retained the standard.[11] *Burnett* illuminated, however, the requirements of the three-pronged test:

> If the three-prong test is read in the context of the instructive analysis which precedes it in *Gibbard,* it becomes evident that the rule of the case is that *willful and wanton misconduct is made out only if the conduct alleged shows an intent to harm or, if not that, such indifference to whether harm will result as to be the equivalent of a willingness that it does. Willful and wanton misconduct is not, as the* Gibbard *Court observed, a high degree of carelessness.* The poorly phrased three-prong test for willful and wanton misconduct in *Gibbard* is cast entirely in language of ordinary negligence until, in the third element, it is said that it must be shown that an injury "is likely." It is in that concept—the notion that in the circumstances of a given case the injury is probable, or to be expected, or likely—that is found the requisite indifference to harm tantamount to a willingness that it occur, if not a specific intent that it does, which distinguishes willful and wanton misconduct from ordinary negligence. [*Id.* at 455-456. Emphasis added.]

Our courts have applied the standard of wilful and wanton misconduct to cases brought pursuant to the good samaritan act, MCL 691.1502; MSA

---

[11] *Burnett* examined whether the plaintiffs alleged sufficient facts for a claim of gross negligence or wilful and wanton misconduct under the recreational use statute (RUS), MCL 300.201; MSA 13.1485. Similar to cases applying the EMSA, the cases applying the RUS use *Gibbard's* definitions of gross negligence and wilful and wanton misconduct.

14.563(12); see *Higgins v Detroit Osteopathic Hosp
Corp,* 154 Mich App 752, 760-761 (1986), the since
rejected guest passenger act, former MCL 257.401;
MSA 9.2101;[12] *Tien v Barkel,* 351 Mich 276, 281-
282; 88 NW2d 552 (1958); the recreational use
statute, MCL 300.201; MSA 13.1485; *Burnett,* as
well as the EMSA, and *Malcolm, supra.* While the
first four statutes allow a plaintiff to recover for
injuries caused by *"wilful and wanton miscon-
duct,"* the EMSA permits a plaintiff to recover only
for injuries caused by *"wilful misconduct."* Thus,
the operable question is whether the standard for
"wilful and wanton misconduct" may be used to
decide allegations of "wilful misconduct."

### B

We are persuaded that the answer is *no.* When a
statute fails to define a term, we will construe it
"according to its common and approved usage
. . . ." *State ex rel Wayne Co Prosecutor v Leven-
burg,* 406 Mich 455, 465; 280 NW2d 810 (1979).
The phrases "wilful misconduct" and "wilful and
wanton misconduct" possess distinct meanings.

On the one hand, wilful involves design and
purpose. *Montgomery v Muskegon Booming Co,* 88
Mich 633, 641; 50 NW 729 (1891). "Wilful means

---

[12] While we held the guest passenger act (GPA) unconstitutional in
*Manistee Bank v McGowan,* 394 Mich 655; 232 NW2d 636 (1975), we
initially applied *Gibbard's* gross negligence and wilful and wanton
misconduct standards to cases brought under it. *Finkler,* n 4 *supra.*
We soon recognized, however, the inappropriateness of *Gibbard's*
gross negligence, terminating its use. We employed as a substitute,
the wilful and wanton misconduct standard—"the term gross negli-
gence as used in this statute [is] synonymous with wilful and wanton
misconduct." *Pawlicki v Faulkerson,* 285 Mich 141, 144; 280 NW 141
(1938). See also *Riley v Walters,* 277 Mich 620, 632-633; 270 NW 160
(1936). We assume that the Legislature was aware of our construction
of the GPA's "gross negligence or wilful and wanton misconduct." As a
result, we are compelled to conclude that the Legislature rejected the
use of this construction in conjunction with the EMSA, as evidenced by
its use of the phrase "gross negligence or wilful misconduct."

intentional." *McKimmy v Conductors Protective Assurance Co,* 253 Mich 521, 523; 235 NW 242 (1931).

> Willful. Proceeding from a conscious motion of the will; voluntary; knowingly; deliberate. Intending the result which actually comes to pass; designed; intentional purposeful; not accidental or involuntary. [Black's Law Dictionary (6th ed), p 1599.]

Wilful and wanton misconduct, on the other hand, describes conduct that is *either* wilful—i.e., intentional, *or* its effective equivalent. "[W]illful and wanton misconduct is made out only if the conduct alleged shows an intent to harm *or, if not that, such indifference to whether harm will result as to be the equivalent of a willingness that it does." Burnett* at 455 (emphasis added).

A panel of the Court of Appeals recognized this distinction when examining a case governed by the EMSA in *Pavlov v Community EMS, Inc,* 195 Mich App 711, 716-717; 491 NW2d 874 (1992). We approve its reasoning:

> Plaintiff here, however, relies on authority construing the phrase "wilful and wanton misconduct." We think the two differ significantly. "Wanton" conduct is "reckless," conduct that "amounts to" wilful injury, see, e.g., *LaCroix v Grand Trunk W R Co,* 379 Mich 417, 424; 152 NW2d 656 (1967), but without intent. As the Supreme Court said in discussing *Gibbard, supra,* conduct that shows "such indifference to whether harm will result as to be the equivalent of a willingness that it does" fits the "wanton" prong of the "wilful and wanton" standard. *Burnett* [*supra*]. A standard that permits liability for "wilful and wanton conduct" is less restrictive than one that confines liability to

"wilful" conduct alone. *The former allows liability when the defendant is so careless as to, in effect, intend harm, but the latter requires that intent actually be present.* [Emphasis added.]

While it is unfortunate that the judiciary and the Legislature have used the phrase "wilful *and* wanton misconduct," as opposed to "wilful *or* wanton misconduct," it is nevertheless apparent that only one of the two types of misconduct are required. This is evidenced by our case law:

> "One who is properly charged with . . . wantonness is not simply more careless than one who is only guilty of negligence. His conduct must be such as to put him in the class with the wilful doer of wrong. The only respect in which his attitude is less blameworthy than that of the intentional wrongdoer is that, instead of affirmatively wishing to injure another, he is merely willing to do so. The difference is that between him who casts a missile intending that it shall strike another and him who casts it where he has reason to believe it will strike another, being indifferent whether it does so or not." [*Gibbard* at 321.]

This conclusion is also supported by every day common sense. The term "wilful" requires a finding of an actual intent to harm, while the term "wanton" is an intent inferred from reckless conduct. To require a showing of both states of mind defies logic and is internally inconsistent. Neither this Court nor the Legislature can expect one person to simultaneously have two inconsistent states of mind. Such an interpretation is contrary to the well-established principle of statutory construction that statutes are to be construed to avoid

absurd results.[13] *Gardner v Van Buren Public Schools,* 445 Mich 23, 43-44; 517 NW2d 1 (1994).

We also recognize the principle that "express mention in a statute of one thing implies the exclusion of other similar things." *Stowers v Wolodzko,* 386 Mich 119, 133; 191 NW2d 355 (1971). Adherence to this principle in *Stowers* compelled our holding that where a statute authorizes "detain[ing]" an alleged mental patient until a hearing can be held, it does not authorize detaining *and* treating the patient. Correspondingly, the EMSA permits recovery for acts of wilful misconduct, *not* acts of wilful and wanton misconduct. We must apply the statute as written by the Legislature. " 'The duty of the Court is to interpret the statute as we find it. The wisdom of the provision in question in the form in which it was enacted is a matter of legislative responsibility with which courts may not interfere.' " *City of Lansing* at 648 (citation omitted). Accordingly, we hold that a plaintiff alleging wilful misconduct under the EMSA must allege that the actor intended to harm the plaintiff.

### III. *BORODITSCH v COMMUNITY EMS*[14]

On February 26, 1988, the plaintiff's husband

---

[13] On these grounds, the instant situation is readily distinguished from the situation we encountered in *People v Bullock,* 440 Mich 15, 30; 485 NW2d 866 (1992). In *Bullock,* we held that the use of the phrase "cruel *or* unusual" punishment in the Michigan Constitution "does not appear to be accidental or inadvertent." Application in *Bullock* of the phrase as written did not create an impossible and internally inconsistent rule of law. We reach the opposite conclusion, however, about the Legislature's use of the phrase "wilful and wanton misconduct" because of the impossible and internally inconsistent rule of law that would result from a literal interpretation.

[14] For purposes of review, we are compelled to view the facts in a light most favorable to the plaintiff. In harmony with our rules, we leave to the trier of fact the task of determining which set of facts are true.

had what proved to be a fatal heart attack. The plaintiff, a retired registered nurse, telephoned for emergency assistance. The dispatcher sent both a fire department ambulance and an ambulance operated by the defendant, Community Emergency Medical Services.

The fire department ambulance arrived first. At this time, the plaintiff's husband was not breathing and he did not have a heartbeat. A heartbeat monitor detected only irregular fibrillation.

When the defendant's ambulance arrived shortly thereafter, its personnel took over because of their higher level of medical training.[15] AEMT, Raymond Hopp, attempted to establish an airway into Mr. Boroditsch's lungs to aid the administration of oxygen. This procedure is known as intubation. The tube is inserted through the mouth of the patient, past the vocal cords and into the trachea. Once positioned, a cuff on the end of the tube is inflated to secure the positioning of the tube. After positioning the tube and inflating the cuff, Mr. Hopp secured its position by taping it down.

After intubation, the defendant's personnel transported Mr. Boroditsch to the hospital. Mrs. Boroditsch accompanied her husband to the hospital, sitting in the front seat of the ambulance. Mrs. Boroditsch testified in her deposition that during the trip she noticed that her husband's stomach was distended. The AEMTs asserted that it was already distended when they arrived at the Boroditsch home. Shortly after his arrival at the hospital, Mr. Boroditsch was pronounced dead.

The plaintiff filed suit against the defendant in Oakland Circuit Court on February 10, 1989. The plaintiff's key allegation is that the AEMTs errone-

---

[15] The defendant's ambulance was staffed by two advanced emergency medical technicians (AEMT), and one EMT in training to be an AEMT.

ously inserted the endotracheal tube into Mr. Boroditsch's esophagus instead of his trachea. As a result of this error, oxygen was pushed into the stomach as opposed to the lungs. In addition, the erroneous positioning of the tube prevented any possibility of normal breathing.

In support of her claim, the plaintiff offered not only her observation that Mr. Boroditsch's stomach was distended, but also the emergency room physician's note sheet which stated:

Et tube replaced—was in esophagus.

While the defendant asserts that the tube must have shifted positions while Mr. Boroditsch was transferred from the ambulance to the emergency room, the plaintiff's expert found this highly unlikely because the tube was securely taped and nothing unusual occurred during the transfer. In addition, the plaintiff's expert opined that had the AEMTs checked the tube's placement with ordinary care, they would have discovered its improper positioning. It was the expert's opinion that the improper placement of the tube caused the decedent's death.

Following an amendment to plaintiff's complaint, making specific allegations of "gross negligence" and "wilful misconduct," the defendant moved for summary disposition under MCR 2.116(C)(7), (8), and (10). Following a hearing, Oakland Circuit Judge Robert Templin granted the defendant's motion because the plaintiff failed to make a showing of gross negligence per *Gibbard*—there was no evidence of subsequent negligence.

The trial court also granted the defendant's motion for summary disposition on the alternative allegation of wilful misconduct because the plain-

tiff had not alleged "such an indifference to whether harm will result as to be the equivalent of a willingness that it does result." The Court of Appeals reluctantly affirmed. We granted leave to appeal.

### A

#### GROSS NEGLIGENCE

The trial court granted the defendant's motion for summary disposition pursuant to MCR 2.116(C)(8) because the plaintiff's complaint failed to allege that the defendant's negligence occurred after negligence on the part of the plaintiff's decedent. Having rejected *Gibbard's* gross negligence, the trial court's ruling cannot stand. The operable question, therefore, is whether the plaintiff's complaint alleged gross negligence as defined in § 7 of the GTLA. Specifically, did the complaint allege facts sufficient to show that the defendant's "conduct [was] so reckless as to demonstrate a substantial lack of concern for whether an injury results."

Generally, when we review a trial court's grant of summary disposition pursuant to MCR 2.116(C)(8), we review results that were decided under the correct (or substantially correct) standard of the law. Unfortunately, neither the parties nor the trial court could predict that we would discard *Gibbard's* definition of gross negligence and adopt the GTLA standard.[16] Because the trial court did not have the opportunity to decide the defendant's motion for summary disposition under the proper standard, we vacate its original order and remand

[16] While we have previously stated our dissatisfaction with *Gibbard's* gross negligence, see *Burnett* at 454, until today we have repeatedly announced that it was the applicable standard in Michigan. *Id.*

this case to the trial court for proceedings consistent with this opinion.[17]

We do not retain jurisdiction.

B

.WILFUL MISCONDUCT

The trial court granted the defendant's motion for summary disposition pursuant to MCR 2.116(C)(8) because the plaintiff failed to allege wilful and wanton misconduct as defined in *Burnett, supra.* While it is true that we have decided that the wilful and wanton misconduct standard will no longer be applied to allegations of wilful misconduct under the EMSA, a remand to the trial court is unnecessary.

In its decision, the trial court used the more easily satisfied standard of "wilful and wanton misconduct." It found that the plaintiff not only failed to allege an intent to harm, but that she also failed to allege "such an indifference to whether harm will result as to be the equivalent of a willingness that it does result."[18] While the trial court used the "wilful and wanton misconduct" standard, a determination under this standard necessarily included a review under the "wilful standard." A review of the pleadings in a light most favorable to the plaintiff does not reveal that the plaintiff alleged that the AEMTs intended to harm the plaintiff's decedent. As a result, we hold that the grant of summary disposition as to wilful misconduct was appropriate.

---

[17] Similarly, we vacate Judge Templin's grant of summary disposition pursuant to MCR 2.116(C)(10), finding no genuine issue of material fact regarding gross negligence, and remand this case for consideration of the defendant's motion consistent with this opinion.

[18] Because the wanton standard is inapplicable under the EMSA, this opinion does not address whether the plaintiff failed to allege "such an indifference to whether harm will result as to be the equivalent of a willingness that it does result."

## IV. *JENNINGS v SOUTHWOOD*

The plaintiff[19] filed suit in the Berrien Circuit Court on January 15, 1988, against defendant Lake Township Municipality, its ambulance service, Lake Township Ambulance and Rescue, and the individual EMS personnel, Richard Southwood and Bill Boyd, seeking damages for gross negligence.[20] The plaintiff's key allegation is that the defendants refused to transport thirteen-year-old Cynthia Rasmussen, a diabetic and epileptic, to the hospital on November 25, 1986. As a result of the defendants' refusal, Cynthia slipped into a diabetic coma later that evening and has been unconscious ever since.

By October 1988, the trial court dismissed the municipality, holding that it could not be vicariously liable on grounds of governmental immunity. During the subsequent jury trial, the trial court instructed the jury about gross negligence using the GTLA definition. During the instruction, the court gave examples of gross negligence in the context of the criminal law. Plaintiff's counsel specifically objected to the use of such examples.

Following deliberations, the jury reached a verdict of no cause of action, and the trial court denied the plaintiff's motion for a new trial. The plaintiff filed an appeal of right in the Court of Appeals, alleging two errors: (1) an instructional error concerning the use of criminal examples to demonstrate civil gross negligence, and (2) an error regarding the trial court's grant of summary disposition to the municipality on the grounds of governmental immunity.

The Court of Appeals issued a per curiam opin-

---

[19] Plaintiff is the conservator of Cynthia Rasmussen's estate.

[20] The plaintiff does not advance a claim under a theory of wilful misconduct.

ion, affirming the judgments for the defendants on the basis of an issue that it raised sua sponte and resolved against the plaintiffs. 198 Mich App 713; 499 NW2d 460 (1993). Because the plaintiff failed to plead and prove that Cynthia was negligent before the defendants' negligence, the plaintiff failed to demonstrate gross negligence as defined in *Gibbard,* rendering the defendants immune from suit under the EMSA. The majority also concluded that the trial court erred in using criminal examples of gross negligence and dismissing the municipality on governmental immunity grounds; it held, however, that these errors were harmless in light of plaintiff's failure to plead and prove gross negligence pursuant to *Gibbard.*

We granted the plaintiff's application for leave to appeal, as well as the defendants' cross-application for leave to appeal. The issues remaining are (1) whether governmental immunity under the GTLA bars suit against the defendant municipality,[21] and (2) whether the trial errors regarding the use of criminal examples for gross negligence and the dismissal of the defendant municipality require a new trial.

A

The Court of Appeals held that the trial court erred in granting summary disposition for the municipal defendants. The error was harmless, however, because the plaintiff could not prove gross negligence under *Gibbard,* and, as a result, the municipal defendants could not be vicariously liable.

"Defendants assert that the EMS provision does not expressly abrogate the complete immunity for municipal entities performing governmental func-

[21] The defendants' cross-application raises this issue.

tions." According to the defendants, if the Legislature intended another exception to governmental immunity (in addition to the four exceptions enumerated in the GTLA), it would have "unequivocally pronounced an intent to create another exception to this absolute immunity in either the EMS Act or the recent 1986 Tort Reform Amendments . . . ."

In *Malcolm,* this Court examined "whether liability may be imposed on a governmental agency pursuant to the provisions in the EMSA, despite the immunity granted in the GTLA." *Id.* at 135. The Court held that the EMSA modified the GTLA, thus providing an exception to the broad grant of immunity afforded governmental units. On the basis of the EMSA's wording and the Legislature's intent, six members of this Court[22] agreed that vicarious liability can be imposed on a governmental unit if the acts or omissions of its EMS personnel were found to constitute gross negligence or wilful misconduct.

The alleged acts of gross negligence in this case, like the *Malcolm* case, occurred before a 1990 amendment. Thus this case is controlled by the construction of the earlier statute, as followed in *Malcolm.* This Court issued its opinion in *Malcolm* in April 1991, after the 1990 amendment. While it acknowledged the amendment, it concluded that the amendment was not to be given retroactive application:

In 1990 PA 179 the Legislature, apparently in response to the Court of Appeals opinion in this case, added subsection (2) to § 20737 (which was also changed to MCL 333.20965; MSA 14.15[20965]) which provides:
"(2) Subsection (1) does not limit immunity from

---

[22] MALLETT, J., not participating.

liability otherwise provided by law for any of the persons listed in subsection (1)."

There was no indication that the amendment was to be given retroactive application; therefore, we do not express a view regarding any effect this amendment may have upon the analysis of this case. [*Malcolm* at 141, n 9.]

Despite this Court's position in *Malcolm,* the defendants assert that the amendment should be given retroactive application. We disagree because six members of this Court concluded otherwise in *Malcolm,* and the 1990 EMSA amendments are not remedial or procedural in nature. *White v General Motors Corp,* 431 Mich 387, 391-394; 429 NW2d 576 (1988).

As a result, we affirm the holding of the Court of Appeals that the dismissal of the defendant municipality on grounds of governmental immunity was erroneous.

B

While the Court of Appeals determined that the trial court erred in granting summary disposition to the municipality and in using criminal examples in its instructions regarding gross negligence, the panel nevertheless determined that the error was harmless in light of the plaintiff's failure to prove *Gibbard*'s gross negligence. Given that the justification can no longer support this conclusion, we vacate the judgment of the Court of Appeals. We remand the case to that Court for further consideration of whether the errors were harmless. See *Petrove* at 34.

We do not retain jurisdiction.

LEVIN, BRICKLEY, RILEY, GRIFFIN, and MALLETT, JJ., concurred with CAVANAGH, C.J.

BOYLE, J., concurred only in the result.