# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

KIMBERLY ANITRA MURPHY,

        Defendant-Appellant.

FOR PUBLICATION
September 19, 2017

No. 331620
Macomb Circuit Court
LC No. 2015-000548-FH

Before: GLEICHER, P.J., and M. J. KELLY and SHAPIRO, JJ.

GLEICHER, J. (*concurring*).

I fully concur with the majority's determination that Kimberly Murphy did not engage in an affirmative act that caused harm to Trinity. I write separately to express my view that even if Murphy's failure to clean her home could be regarded as an "act," it did not meet the applicable mens rea standard: recklessness. This alternative ground also supports vacating Murphy's conviction.

## I. FACTUAL BACKGROUND

No one knows how or where Trinity found the morphine pill that the prosecution theorizes took the child's life. The investigators' best guess is that the pill landed on the floor of Murphy's mother's bedroom at some unknown point in time, and that Trinity found it when she crawled around on the room's un-vacuumed carpet. But this is truly a guess, as the investigators noted that the pills were otherwise contained in a child-proof vial kept in a closet, on a shelf above Trinity's reach.

The trial evidence focused relentlessly on the conditions of the home—the filthy kitchen and bathroom, the smelly garbage bags in the laundry room, and the unpleasant, dirty, and, as characterized by an investigator, altogether "deplorable" state of the home. No evidence was presented, however, about any specific circumstances that led to Trinity's ingestion of the pill. After Murphy's mother, Muriel Cheeks, died of cancer, one of Murphy's adult children moved into Cheeks's bedroom. Trinity watched television in that room during the evening before the child died. The lead investigator speculated that Cheeks or one of her caregivers may have accidentally dropped one of Cheeks's brownish-colored morphine pills on the brown carpet, and that two weeks later, Trinity ate it.

-1-

During her closing argument, the prosecutor strenuously maintained that Murphy's tolerance of the filthy living conditions equated with a reckless act consistent with second-degree child abuse: "Their recklessness was their inability to care. Their indifference to consequence. Their inability to go in and make sure that medication was taken out of the house. Make sure that room was kept in an environment fit for children." The prosecutor emphasized the filthy conditions in the home and that Child Protective Services had previously intervened for that reason:

> There was evidence in the case that talked about the defendants' prior Child Protective Service history. And that's really important because we know that this isn't a onetime thing. This is how they've always been. Their whole entire lives.

> Services were provided to this family. Is there anything we can do to help you make your home conditions more fit? More fit for your children. We will do anything we need to do. We will help you pay your rent. We will help you with your heating bill. We will provide you beds. But every [sic] their hands out to get any of these services, they don't turn around and do anything to better their children. In fact, their children were consistently sent to school in unkempt conditions.

> And why is that important? It leads directly back to their lifestyle. The lifestyle they've always had. One in which that was reckless and one that is just indifferent to the consequences of their actions.[1]

In her rebuttal argument the prosecutor persisted in hammering this theme:

> Their recklessness was their inability to care. Their indifference to consequence. Their inability to go in and make sure that medication was taken out of the house. Make sure that room was kept in an environment fit for children. An environment that they were taught about. Child Protective Services comes in their house. Let's help fix this. Let's do what we need to do. Here's an intensive program. Here's another program. Here's another program. This isn't an accident. This isn't some oh well we didn't know. It's not cleaning day. It's not laundry day. We just didn't vacuum. They didn't even find a vacuum in the house. There's a brand new broom.

> * * *

> There were no cleaning supplies in the house. Police said that and found nothing in the (inaudible).

---

[1] The trial court sustained an objection to this argument but did not instruct the jury to disregard it.

That's the defendant's recklessness. That's what they did. They're [sic] unkempt house. They're [sic] inability to clean. They're [sic] inaction caused Trinity to die. It was not Trinity's time to go. That baby is not here today because of what they failed to do. Give her living conditions that were safe.

The trial court instructed the jury that it could find Murphy guilty if it determined that Murphy had committed "some reckless act," as a result of which "Trinity Murphy suffered a serious physical harm." The court defined "reckless" as "[u]tterly unconcerned about the consequences of some action. Indifferent to consequences."

## II. RECKLESSNESS, NEGLIGENCE, AND THE CRIMINAL LAW

According to the prosecutor's brief on appeal, "[a]t trial, the People argued that Defendant's 'reckless act' was her failure to protect Trinity by maintaining a safe living environment, and that such recklessness ultimately allowed Trinity to find and ingest the morphine." The majority correctly rejects this argument, summarizing that "[s]imply failing to take an action does not constitute an act." I would add that even if Murphy "acted" by permitting Trinity access to Cheeks' bedroom, as a matter of law that act was not reckless.

Unfortunately, the Legislature did not provide a definition of the term "reckless" used in the second-degree child abuse statute, MCL 750.136b(3)(a). In *People v Gregg*, 206 Mich App 208; 520 NW2d 690 (1994), this Court considered whether the fourth-degree child abuse statute, MCL 750.136b(5), was unconstitutionally vague because it too lacks a definition of "reckless." We concluded that a dictionary definition sufficed to explain the term, and cited two dictionaries for guidance:

Black's Law Dictionary (6th ed) defines "reckless" as:

Not recking; careless, heedless, inattentive; indifferent to consequences. According to circumstances it may mean desperately heedless, wanton or willful, or it may mean only careless, inattentive, or negligent. For conduct to be "reckless" it must be such as to evince disregard of, or indifference to, consequences, under circumstances involving danger to life or safety to others, although no harm was intended.

*The Random House College Dictionary, Revised Edition*, defines "reckless" as:

1. utterly unconcerned about the consequences of some action; without caution; careless . . . . 2. characterized by or proceeding from such carelessness. [*Id*. at 212.]

"Given these dictionary definitions of the word 'reckless' and applying its plain and ordinary meaning to the language of the statute," this Court upheld the statute's constitutionality. *Id*.

In the years since *Gregg* was decided, a number of unpublished decisions have cited it for the proposition that garden-variety carelessness is included in the definition of "recklessness" under the second or fourth-degree child abuse statutes. Here, the trial court used the first

-3-

*Random House College Dictionary* definition to instruct the jury as to the term's meaning ("utterly unconcerned about the consequences of some action").

I respectfully suggest that *Gregg* was wrongly decided, and that this case showcases the need for a definition of "reckless" consistent with fundamental criminal law principles rather than dictionary definitions.[2]

The Legislature is free to make certain acts criminal regardless of intent, *People v Quinn*, 440 Mich 178, 189; 487 NW2d 194 (1992), just as it may decide to "impose a criminal responsibility for a tort that theretofore carried with it only civil liability." *People v McMurchy*, 249 Mich 147, 162; 228 NW 723 (1930). This Court has similarly expounded that "[t]he Legislature has the power to define a crime without regard to the presence or absence of criminal intent or culpability in its commission." *People v McKee*, 15 Mich App 382, 385; 166 NW2d 688 (1968). When the Legislature identifies a requisite intent without defining it, I submit that the legal definition of that intent must comport with the common law. Under the common law, "recklessness" and "carelessness" involve different and distinct mental states, and this Court erred in *Gregg* by conflating them.

When a statute omits a definition of a legal term of art, our Supreme Court looks to the common law for guidance. In *McMurchy*, 249 Mich at 169-170, our Supreme Court elucidated the definition of "negligence" that applied to the negligent homicide statute under consideration. "Negligence . . . consists of a want of reasonable care or in the failure of duty which a person of ordinary prudence should exercise under all the existing circumstances in view of the probable injury." *Id*. The "settled" law regarding negligence "is neither vague, uncertain, or indefinite," the *McMurchy* Court explained, and "[j]ust as we can ascertain civil liability by certain rules, so also can we determine criminal liability by similar rules." *Id*. at 170-171. And "[t]he very same evidentiary facts required to prove civil liability for negligence may be used to prove criminal liability." *Id*. at 170.

Recklessness and negligence are not interchangeable legal concepts, however. Our Supreme Court has defined reckless misconduct in the civil context as bordering on willfulness; the reckless actor appreciates that harm may result from his act, but does not care:

---

[2] *Gregg* relied in part on the sixth edition of *Black's Law Dictionary*, which was published in 1990. The current edition defines "reckless" differently, and in a manner consistent with use of the term by most courts:

> Characterized by the creation of a substantial and unjustifiable risk of harm to others and by a conscious (and sometimes deliberate) disregard for or indifference to that risk; heedless; rash. Reckless conduct is much more than mere negligence; it is a gross deviation from what a reasonable person would do. [*Black's Law Dictionary* (10th ed), p 1462.]

The dictionary then directs readers to compare—"Cf."—the contrasting definition of "careless."

> "One who is properly charged with recklessness or wantonness is not simply more careless than one who is only guilty of negligence. His conduct must be such as to put him in the class with the wilful doer of wrong. The only respect in which his attitude is less blameworthy than that of the intentional wrongdoer is that, instead of affirmatively wishing to injure another, he is merely willing to do so. The difference is that between him who casts a missile intending that it shall strike another and him who casts it where he has reason to believe it will strike another, being indifferent whether it does so or not." [*Gibbard v Cursan*, 225 Mich 311, 321; 196 NW 398 (1923), quoting *Atchison, Topeka & Sante Fe R Co v Baker*, 79 Kan 183; 98 P 804 (1908).]

The Legislature's approach to the gross negligence exception to governmental immunity sheds further light on the meaning of "recklessness" under Michigan law by equating the two concepts. Gross negligence is defined by the statute as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." MCL 691.1407(2)(c). The Supreme Court has followed the Legislature's lead, using the terms "gross negligence" and "reckless" interchangeably when interpreting the meaning of "gross negligence." See *Maiden v Rozwood*, 461 Mich 109, 123; 597 NW2d 817 (1999) ("In addition to requiring that a plaintiff show reckless conduct, the content or substance of the evidence proffered must be admissible in evidence.").

> This Court has applied the gross negligence/recklessness standard quite rigorously:

> Gross negligence is defined as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." Simply alleging that an actor could have done more is insufficient under Michigan law, because, with the benefit of hindsight, a claim can always be made that extra precautions could have influenced the result. However, saying that a defendant could have taken additional precautions is insufficient to find ordinary negligence, much less recklessness. Even the most exacting standard of conduct, the negligence standard, does not require one to exhaust every conceivable precaution to be considered not negligent.

> The much less demanding standard of care—gross negligence—suggests, instead, almost a willful disregard of precautions or measures to attend to safety and a singular disregard for substantial risks. It is as though, if an objective observer watched the actor, he could conclude, reasonably, that the actor simply did not care about the safety or welfare of those in his charge. [*Tarlea v Crabtree*, 263 Mich App 80, 90; 687 NW2d 333 (2004) (citation omitted).]

Assuming that under Michigan law gross negligence and reckless are roughly congruent concepts, the standard they describe differs substantially from that of general negligence. A grossly negligent or reckless individual is willfully indifferent to the safety of others, while a negligent actor merely fails to measure up to the standard of ordinary care.

> The United States Supreme Court explored the meaning of the term "recklessness" in *Farmer v Brennan*, 511 US 825; 114 S Ct 1970; 128 L Ed 2d 811 (1994), a case addressing the

liability of prison officials for assaults committed by inmates against a transsexual prisoner. Longstanding Supreme Court precedent established that to state a claim under the Eighth Amendment, a prisoner must prove that prison officials were deliberately indifferent to his or her medical needs. *Id*. at 834. In *Farmer*, the Court explored the meaning of "deliberate indifference," honing in on the mental state required to justify liability. The Court explained that the deliberate indifference standard "entails something more than mere negligence," and something less than "purpose or knowledge." *Id*. at 835-836. The Court observed that many Courts of Appeal had "routinely equated deliberate indifference to recklessness," and turned to a detailed examination of the contours of that standard. *Id*. at 836.

"[T]he term recklessness is not self-defining," the Court began, and its characteristics differ depending on whether the underlying case is civil or criminal:

> The civil law generally calls a person reckless who acts or (if the person has a duty to act) fails to act in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known. See Prosser and Keeton § 34, pp 213-214; Restatement (Second) of Torts § 500 (1965). *The criminal law, however, generally permits a finding of recklessness only when a person disregards a risk of harm of which he is aware.* See R. Perkins & R. Boyce, Criminal Law 850-851 (3d ed 1982); J. Hall, General Principles of Criminal Law 115-116, 120, 128 (2d ed 1960) . . .; American Law Institute, Model Penal Code § 2.02(2)(c), and Comment 3 (1985); but see *Commonwealth v. Pierce*, 138 Mass 165, 175-178 (1884) (Holmes, J) (adopting an objective approach to criminal recklessness). [*Id*. at 836-837 (emphasis added).]

The prisoner-petitioner in *Farmer* urged the Court to adopt the civil-law recklessness paradigm, while the warden-respondent advocated the approach consistent with the criminal law. The Court chose a definition much closer to the latter:

> We hold . . . that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. [*Id*. at 837.]

Summarizing, the Court held, "subjective recklessness as used in the criminal law is a familiar and workable standard that is consistent with the Cruel and Unusual Punishments Clause as interpreted in our cases, and we adopt it as the test for 'deliberate indifference' under the Eighth Amendment." *Id*. at 839-840.

Drawing on these precedents, I suggest that the "reckless" standard incorporated in MCL 750.136b(a) requires proof that a defendant disregarded a known, substantial, and unjustifiable risk of serious injury. In my view, recklessness requires *conscious* disregard of risk—anything

less, such as mere "indifference," is more consistent with negligence.[3]  A second aspect of the "recklessness" concept bears emphasis.  When used in civil cases in Michigan or by the United States Supreme Court, determining whether conduct is "reckless" inherently involves an assessment of *risk*.  Shortcutting the analysis to "carelessness" or "utter indifference to consequences" omits this critical component of the concept.[4]

The portion of the second-degree child abuse statute governing Murphy's prosecution does not criminalize parental negligence.  Rather, the prosecutor charged Murphy under the subsection of the statute declaring that "a person is guilty of child abuse in the second degree if . . . the person's reckless act causes serious physical harm or serious mental harm to a child."  MCL 750.136b(3)(a).  The same subsection of the statute permits conviction on proof that "the person's omission causes serious physical harm or serious mental harm to a child."  Notably, the Legislature specifically defined the "omission" in this context as "a *willful* failure to provide the food, clothing, or shelter necessary for a child's welfare or the *willful* abandonment of a child."  MCL 750.136b(c).

The statutory language leads to two inescapable conclusions: the Legislature intended that a person could be convicted under MCL 750.136b(c) only on proof of "recklessness" or "willful" failure to provide for a child's needs.  The statute simply does not countenance conviction based on mere negligence, despite *Gregg*.

The Model Penal Code supplies a definition of "recklessly" that comports with Michigan law and, in my view, merits adoption:

> A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material

---

[3] Although somewhat difficult to parse, obiter dictum in *People v Datema*, 448 Mich 585, 598-599; 533 NW2d 272 (1995), seems to signal the Court's approval of a definition of "reckless" that incorporated the concepts of "wantonness" and "willfulness."  "Wilful and wanton misconduct . . . describes conduct that is *either* wilful—i.e., intentional, *or* its effective equivalent.  'Willful and wanton misconduct is made out only if the conduct alleged shows an intent to harm *or, if not that, such indifference to whether harm will result as to be the equivalent of a willingness that it does.*' "  *Jennings v Southwood*, 446 Mich 125, 140; 521 NW2d 230 (1994) (emphasis in original).

[4] These ideas are neither new nor my own.  As a justice of the Massachusetts Supreme Court, Oliver Wendell Holmes described the role of risk as follows:

> If men were held answerable for everything they did which was dangerous in fact, they would be held for all their acts from which harm in fact ensued.  The use of the thing must be dangerous according to common experience, at least to the extent that there is a manifest and appreciable chance of harm from what is done, in view either of the actor's knowledge or of his conscious ignorance. [*Commonwealth v Pierce*, 138 Mass 165, 179 (1884).]

element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation. [Model Penal Code, § 2.02(c).]

Many states have adopted this definition, either statutorily or under the common law. See *State v O'Connell*, 149 Vt 114, 115 n 1; 540 A2d 1030 (1987); *People v Hall*, 999 P2d 207, 217 (Colo, 2000); *State v Chavez*, 146 NM 434, 445-446; 211 P3d 891 (2009).

*Chavez* supplies valuable insights applicable in child abuse cases. The defendant in that case was convicted of child abuse by endangerment based on "impoverished and dirty living conditions that, in the State's opinion, posed a significant danger" to Chavez's children. *Id*. at 436. One of the children, Shelby, died after having been placed to sleep in a dresser drawer filled with blankets and padding when her bassinet broke. *Id*. The jury acquitted the defendant of child abuse resulting in death, but found him guilty of child abuse by endangerment regarding that child and two other surviving children. *Id*.

The New Mexico Supreme Court granted leave to "explore the sufficiency and nature of the evidence necessary to sustain a child endangerment conviction when it is based only on filthy living conditions and without any underlying criminal conduct." *Id*. The Court observed that the applicable jury instruction directs the jury that to convict of child endangerment, it must find that "defendant's conduct created a *substantial and foreseeable risk* of harm." *Id*. at 440 (emphasis in original, quotation marks omitted). Whether the charged conduct meets that standard, the Court explained, depends on "the gravity of the risk that serves to place an individual on notice that his conduct is perilous, and potentially criminal[.]" *Id*. at 441. The Court reviewed cases from New Mexico and other jurisdictions in which convictions had been reversed because the risk of harm was "too remote, which may indicate that the harm was not foreseeable." *Id*. As applied to cases involving "filthy living conditions," the Court concluded that the state bears the burden of proving "a substantial and foreseeable risk that such filthy living conditions endangered the child." *Id*. at 442.

The *Chavez* Court also addressed in detail the charge levied against the defendant arising from his daughter's death. The state pursued that prosecution "under a criminal negligence theory and, therefore, was required to prove beyond a reasonable doubt that Defendant 'knew or should have known of the danger involved and acted with a reckless disregard for the safety and health of the child.' " *Id*. at 445.[5] The Court summarized this burden as follows:

Thus, the State had the burden to first establish the actus reus of endangerment—that the drawer created a substantial and foreseeable risk of harm. Once the danger is established, the State must also show that a reasonable person would have apprehended the risk, and that Defendant recklessly disregarded the risk by allowing Shelby to sleep in the drawer.

---

[5] The Court specifically noted that this requirement was based on Model Penal Code, § 2.02(c).

The State sought to show that the sleeping arrangement created a serious danger to Shelby due to Shelby's size in relation to the drawer and bedding. At five months old, Shelby was approximately twenty-six inches long. The drawer that Defendant chose for his daughter measured 29–by–15 inches. Several witnesses testified that the drawer, particularly when filled with soft bedding and a blanket, did not allow Shelby much room to move around. The State presented testimony that if the bedding blocked Shelby's nose and mouth, she may not have had room to free herself, creating a possibility that she could suffocate. In addition, witnesses testified that if Shelby became pressed up against the wall of the drawer, she might re-breathe her expelled air, high in carbon dioxide, creating a risk of asphyxiation. This is the sort of substantial injury contemplated by our endangerment statute.

However, in addition to the gravity of the potential injury, we must also consider whether it was foreseeable that an injury would actually occur. In performing this review, we note the absence of evidence in the record to indicate that the sleeping conditions presented anything more than a mere possibility of harm. [*Id*. at 446.]

The trial evidence supported only that placing a child to sleep in a drawer carried a "very small, unpredictable and unmeasurable" degree of risk, especially when compared with "failing to secure a child in a car seat." *Id*. Further, the Court expounded, "[t]he elevated risk, if any, created by the small size of the drawer in relation to Shelby's body, and by including soft bedding in the drawer which restricted the infant's ability to move, is not quantifiable based solely on common knowledge or experience." *Id*. at 446-447. In language I find directly pertinent here, the Court expressed:

Specific evidence was needed to assist the jury in ensuring that a conviction would be based on science and not emotion. This is particularly important in this case, where the trial focused on the death of an infant and the level of parenting was easy to criticize. Natural factors of sympathy and even outrage in the face of an infant death can create a perilous situation where judgment is based on emotion and not evidence. [*Id*. at 447.]

## III. APPLICATION

Applying the legal framework I have described, I conclude that Murphy's failure to vacuum her mother's bedroom or otherwise locate the stray pill did not evidence conscious disregard of a substantial and unjustifiable risk that death would result from her conduct. Perhaps Murphy was negligent in failing to clean Cheeks' room, and in permitting Trinity to crawl on a dirty carpet. But the standard is recklessness, not negligence. It stretches credulity that Murphy or any objective, reasonable person would have perceived that allowing the child in that room would expose her to a substantial and unjustifiable risk of serious harm. No evidence supports that Murphy consciously disregarded a *foreseeable* risk that the child would find something fatally toxic on the carpet and die; the pills were in a child-proof container and on a shelf above Trinity's reach. Nor can such awareness on Murphy's part be inferred. What occurred here was unforeseen, wholly unanticipated, and shocking. While most people

-9-

understand that filthy living conditions are not healthy for a child, it is a quantum leap to conclude that a dirty home necessarily presents a substantial and foreseeable risk of serious injury. And in this case, the harm was simply not predictable or foreseeable.

To demonstrate that Murphy's conduct created a substantial and unjustifiable risk of serious harm, the prosecutor would have had to produce some fact or create some inference supporting that Murphy knew or should have known that a pill had fallen on the carpet, or likely had fallen. No such facts or inferences exist. Even after all of the evidence collection and analysis had been completed, the source of the pill remains unclear. Assuming it was on the carpet—a good guess, but a guess nevertheless—no one knows when, how, or why that happened. The evidence did not come close to establishing a foreseeable danger or that Murphy disregarded a known, substantial and unjustifiable risk.

As in *Chavez*, this was a case built on emotion rather than fact or law. See *id*. at 447. Because any possible "act" that Murphy engaged in did not qualify as reckless, I would vacate her conviction on this ground.

/s/ Elizabeth L. Gleicher