*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* Application of DTE ELECTRIC COMPANY to Increase Rates.

DTE ELECTRIC COMPANY,

Petitioner-Appellant,

v

MICHIGAN PUBLIC SERVICE COMMISSION, ASSOCIATION OF BUSINESSES ADVOCATING TARIFF EQUITY, and RESIDENTIAL CUSTOMER GROUP,

Appellees,

and

MICHIGAN ENVIRONMENTAL COUNCIL,

Intervening Appellee.

UNPUBLISHED
February 25, 2021

No. 349924
Public Service Commission
LC No. 00-020162

*In re* Application of DTE ELECTRIC COMPANY to Increase Rates.

RESIDENTIAL CUSTOMER GROUP,

Appellant,

v

MICHIGAN PUBLIC SERVICE COMMISSION,
MICHIGAN CABLE TELECOMMUNICATIONS

No. 350008
Public Service Commission
LC No. 00-020162

ASSOCIATION, and ASSOCIATION OF
BUSINESSES ADVOCATING TARIFF EQUITY,

        Appellees,

and

DTE ELECTRIC COMPANY,

        Petitioner-Appellee.

Before:  M.J. KELLY, P.J., and RONAYNE KRAUSE and REDFORD, JJ.

PER CURIAM.

This matter arises in part out of a request by petitioner-appellant DTE Electric Company (DTE) to increase its retail electricity rates for the purpose of recouping the cost of various upgrades performed to its River Rouge power plant, which is scheduled to be retired in the near future.  DTE contends that the upgrades were necessary to ensure the plant's safe operation.  In addition, DTE sought to recoup the cost of its deployment of 300 advanced metering infrastructure (AMI), or "smart meters."  In Docket No. 349924, DTE appeals by right the decision of the Michigan Public Service Commission (PSC) that, in relevant part, disallowed the above requested recoupments.  In Docket No. 350008, appellant Residential Consumer Group (RCG) appeals of right a different portion of the same order, generally asserting that the PSC committed a number of legal errors pertaining to the "test year" used for calculating DTE's rates, the applicability of changes in federal tax laws, and the extent to which the PSC permitted DTE to charge for its smart meters.  We vacate the PSC's order as to the amount of its disallowance for the 300 smart meters, and we remand for the PSC to reconsider that allowance.  In all other respects, we affirm.

## I.  STANDARDS OF REVIEW

A final order of the PSC must be authorized by law and be supported by competent, material, and substantial evidence on the whole record.  Const 1963, art 6, § 28; *In re Consumers Energy Co*, 279 Mich App 180, 188; 756 NW2d 253 (2008).  " 'Substantial evidence' is evidence which a reasoning mind would accept as sufficient to support a conclusion.  While it consists of more than a scintilla of evidence, it may be substantially less than a preponderance." *Tomczik v State Tenure Comm*, 175 Mich App 495, 499; 438 NW2d 642 (1989).

A party aggrieved by an order of the PSC has the burden of proving by clear and convincing evidence that the order is unlawful or unreasonable.  MCL 462.26(8).  To establish that a PSC order is unlawful, the appellant must show that the PSC failed to follow a statutory requirement or abused its discretion in the exercise of its judgment.  *In re MCI Telecom Complaint*, 460 Mich 396, 427; 596 NW2d 164 (1999).  A reviewing court "gives due deference to the PSC's administrative expertise and is not to substitute its judgment for that of the PSC." *Attorney General v Pub Serv Comm No 2*, 237 Mich App 82, 88; 602 NW2d 225 (1999).

Issues of statutory interpretation are reviewed de novo. *In re Complaint of Rovas*, 482 Mich 90, 102; 754 NW2d 259 (2008). A reviewing court should give respectful consideration to an administrative agency's interpretation of statutes it is obliged to execute, but not deference. *Id.* at 108.

## II. RIVER ROUGE ELECTRIC GENERATING UNIT 3

DTE Energy operates, inter alia, the River Rouge power plant, a two-generator coal-powered plant. One of the generators was retired in 2016, and the other is scheduled for retirement in the near future. DTE expended significant amounts of money operating and maintaining (O&M) the plant, and it also expended significant amounts of money performing some upgrades that it contends are to ensure the plant's safe operation. The PSC permitted DTE to recover $17.65 million in O&M costs. However, the PSC disallowed a further "$8.45 million in past capital expense and $1.87 million in future capital expense." DTE argues that the PSC erred by disallowing recovery of those capitalized maintenance expenses. We disagree.

As an initial matter, it is important to understand that as a general matter, costs expended by an entity may be treated as "expensed" or "capitalized." Capitalized costs ordinarily entail the acquisition of some tangible asset, or doing something to that tangible asset that significantly increases its usefulness or expected operating life. In contrast, expensed costs ordinarily entail routine and expected maintenance for the purpose of keeping an asset operating normally for its expended lifespan. The significance is that public utilities are, very generally, permitted to make a profit from the combined value of the utility's assets; the combined value of those assets is called the utility's "rate base." Utilities are *also* permitted to directly recoup, dollar-for-dollar, the actual cost of their operating expenses. Whether a particular cost is "capitalized" or "expensed" is significant, because ratepayers pay for both, but ratepayers also pay for a utility to make a profit from anything "capitalized." Thus, it is important that DTE sought to recoup the cost of its upgrades to the River Rouge plant as what it calls "capitalized maintenance expenses," which would have the effect of increasing its rate base, rather than as ordinary operating expenses.

The PSC observed that DTE had sought to recover expenses of the sort here at issue over the course of cases preceding the instant one:

> In the December 11, 2015 order in Case No. U-17767, the Commission disallowed capital costs associated with environmental retrofits for Unit 3 because they were not shown to be cost effective. In the January 31, 2017 order in Case No. U-18014, the Commission again disallowed capital costs for Unit 3. In that order, the Commission found that the utility had decided to permanently shut down River Rouge Unit 2 but had not updated any of the assumptions in the [net present value revenue requirement (NPVRR) analysis] for Unit 3, despite knowing that Units 2 and 3 shared many costs; thus, again failing to show that the capital expenditure was cost effective (the Commission allowed O&M costs). In the 2018 orders, the Commission again disallowed capital costs for Unit 3 based on the continued failure of the utility to update the NPVRR and its entire analysis of Unit 3 with a showing of clear cost effectiveness, but allowed O&M costs. [*In re Application of DTE Electric Co to Increase Rates*, order of the Public Service Commission, entered May 2, 2019 (Case No. U-20162), p 11 (citations omitted)].

## A. EVIDENCE

Matthew Paul, DTE's Vice President of Fossil Generation Plant Operations, testified that although the River Rouge plant was scheduled for retirement in the near future, it still accounted for a non-trivial amount of electrical generation and demand response. As a consequence, it remained important to keep the plant in safe and reliable operating condition to ensure that the electric grid remained stable. He explained that a number of pumps, motors, valves, instruments, and control system components had been replaced for that purpose. The single largest expenditure was reconstruction of part of the Reheat and Intercept Stop Valves. If those valves failed during a generator shutdown, it could result in the turbine exploding with the possibility of injury or loss of life as well as extensive property damage.

Testimony was also introduced regarding cost analysis of the continued operation of the River Rouge plant, as opposed to replacing it. These analyses are referred to as "NPVRR," which is an analysis of the revenue an existing plant needs to bring in to offset its ongoing expenses and initial investment; and "CONE," which is the amount of revenue that a newly-constructed power plant would need to bring in to offset both its ongoing operating expenses and the annualized cost of its construction. Irene Dimitry, Vice President of Business Planning and Development with DTE Energy Corporate Services, LLC, a subsidiary of DTE, concluded that its NPVRR analysis for River Rouge unit 3 showed a "range from $15 million more costly to $10 million less costly to customers to maintain" its current scheduled retirement, dependent upon which costs of fuel assumptions were made. Avi Allison, a senior associate with a research and consulting firm specializing in electricity industry regulation and planning, testified on behalf of the Michigan Environmental Council (MEC) that continuing to operate the River Rouge plant would financially benefit customers only by assuming a worst-case scenario. Allison additionally noted that DTE had made a mistake in calculating its fuel costs. The PSC concluded that after correcting the latter irregularity, ratepayers would benefit from early retirement of the River Rouge plant under all scenarios.

## B. THE DECISION BELOW

The administrative-law judge (ALJ) summarized the history of this issue, and explained as follows in the proposal for decision:

> It has been over three years now since DTE Electric was first put on notice that the economics of operating the River Rouge units had been called into question. The issue became more pronounced in 2016, when [River Rouge Unit 2] retired, leaving previously shared costs to be borne by RR 3 only. Because the company chose not to update its case and present a new NPVRR for RR 3 alone, the Commission deferred the company's proposed capital costs. Then in 2017, DTE Electric again failed to update its analysis of the continued operation of RR 3 and the Commission again deferred cost recovery.

> Through the testimony of Mr. Allison . . . , [the MEC and other intervenors] convincingly showed that the economics of operating RR 3 until the end of the test year is more likely than not to be detrimental to ratepayers and that there is significantly greater benefit to retiring the unit in December 2018. After correcting

DTE Electric's error in its NPVRR analysis, and even using the 50% of CONE scenario, the net benefit of 2018 retirement is still $8 million, whereas under the 100% of CONE price forecast, the net benefit of a 2020 retirement date is only $5 million. . . . Meanwhile, the forecasts for 2019 and 2020 do not appear to demonstrate any issues with available capacity . . . .

The ALJ thus opined that "routine capital costs totaling $1.87 million for 2019 through the end of the test year are not reasonable and prudent and should be disallowed," and also that "O&M costs for 2019 and the test year should also be disallowed on grounds that the record in this case demonstrates that RR 3 could have, and should have, been retired at the end of 2018."

The PSC agreed, explaining as follows:

The Commission sees no reason on this record to deviate from its prior determinations. The Commission continues to agree with DTE Electric that while the unit is in use, reasonable and prudent O&M costs should be approved to ensure safe operation and a smooth transition to retirement. However, the updated NPVRR provided on this record does not persuade the Commission to award the 2017-2018 capital costs to DTE Electric nor the future capital expense, because the evidence is simply not conclusive on the issue of reasonableness and prudence. The NPVRR does not make a convincing case that the 2017-2018 capital expense amounts were prudent in comparison to shutting Unit 3 down in 2016, nor does it make a convincing case that the bridge period and test year amounts make sense in comparison to shutting the unit down earlier than 2020. The company made a decision to continue to run Unit 3 and the unit must be run safely and in compliance with all applicable environmental laws; thus, the Commission has continued to approve O&M costs. But the decision to make capital investments in Unit 3 has not been adequately supported from the beginning. [*In re Application of DTE Electric Co*, order of the PSC entered May 2, 2019 (Case No. U-20162), pp 11-12.]

## C. ANALYSIS

"A public utility has a right to a just and reasonable rate of return on its investment," and such utilities "are protected from being limited to rates that are confiscatory." *ABATE v Pub Serv Comm*, 208 Mich App 248, 269; 527 NW2d 533 (1994). Accordingly, "[a] public utility has a substantive right, set forth in the statutes and rooted in the constitution, to rate relief where the revenue produced by an existing rate structure is less than the amount required by the statutes or the constitution." *Consumers Power Co v Pub Serv Comm*, 415 Mich 134, 145; 327 NW2d 875 (1982) (citations omitted).

DTE argues that disallowing recovery of the capital maintenance expenses it requested for River Rouge Unit 3 constituted confiscatory ratemaking, or an arbitrary denial of its right to reasonable return, with respect to its costs involved in the continued operation of the facility pending its retirement.

DTE suggests it was arbitrary for the PSC to approve recovery of ordinary maintenance expenses while disallowing recovery of capital maintenance expenses, on the ground that the two

-5-

kinds of expenses go hand in hand. However, as noted above and as explained by the PSC, a utility "simply recoups" reasonable and prudent operation and maintenance expenses, but "capital expenditures increase the rate base on which the utility earns a return," such that the ratepayers must bear the burden not only of covering the expenses, but also of providing a reasonable profit on those investments. Thus, "[o]perating and maintenance expenses should not be capitalized without a clear reason for doing so."[1] At issue in this case, then, is not only the reasonableness of the maintenance costs at issue, but also DTE's request to treat those costs as capitalized.

The record does not show that DTE ever made an alternative request to treat those cost as ordinary, dollar-for-dollar recoupable expenses. Furthermore, even if DTE had done so, DTE's analysis of the reasonableness and prudence of those expenses is unduly narrow. Presuming the costs were, in fact, necessary to ensure that the River Rouge plant remained safe to operate, this overlooks whether it was reasonable and prudent to keep the River Rouge plant operating *at all*. The PSC found that it had been imprudent for DTE not to retire and replace the River Rouge plant earlier, instead of expending resources keeping it operational. Thus, it would follow that investing significant resources into upgrading something that should have been retired would also be unreasonable and imprudent. Because the PSC had a sufficient evidentiary basis for concluding that such continued operation was not reasonable, DTE fails to show that the disallowance of the recovery of capitalized maintenance expenses for it was unreasonable or arbitrary.

### III. ADVANCED METERING INFRASTRUCTURE UPGRADE PROJECT

DTE argues that the PSC erred by refusing to authorize recovery of expenses related to upgrading 300 customers from 3G to 4G[2] AMI (or "smart meter") technology, or, alternatively, that the amount of the disallowance was excessive. We find DTE's arguments concerning the need to upgrade those 300 customers to 4G insufficiently persuasive, but we agree with DTE that the PSC's determination of the amount of the disallowance was not supported by the record.

The AMI program generally involves electrical meters transmitting energy consumption information from customers in real time, so customers can make "live" changes to their energy use for reasons such as reducing costs or reducing demands on the system. See *In re Applications of*

---

[1] The PSC cites *In re Application of DTE Electric Co to Increase Rates*, order of the Public Service Commission, entered December 11, 2015 (Case No. U-17767), in which the PSC approved funding for DTE's Enhanced Vegetation Management Program only in part, stating that it was "not persuaded that this cost category is appropriate for capitalization," because the activity was not "fundamentally different from enhanced clearing, the costs of which have never been capitalized." *Id.* at p 17. In affirming the latter decision, this Court recognized that at issue was not the expense of the program, but rather the capitalization of it, and deferred to the PSC's selection of expert testimony upon which to rely. *In re Application of DTE Electric Co to Increase Rates*, unpublished per curiam opinion of the Court of Appeals, issued February 13, 2018 (Docket Nos. 331599, 331868, & 332159), p 5.

[2] 3G, 4G, and 5G refer to "generations" of incremental developments to radio transmission technologies used primarily for cellphones, but also for other devices that communicate using cellular networks.

*Detroit Edison Co*, 296 Mich App 101, 114; 817 NW2d 630 (2012). In 2012, this Court was unconvinced that the evidence in the record had adequately supported funding the project by ratepayers. *Id.* at 114-116. More recently, this Court has been generally, if cautiously, supportive of AMI programs. See *In re Consumers Energy Co*, 322 Mich App 480, 490-491; 913 NW2d 406 (2017); *In re Application of Consumers Energy to Increase Elec Rates (On Remand)*, 316 Mich App 231, 240; 891 NW2d 871 (2016); *Detroit Edison Co v Stenman*, 311 Mich App 367; 875 NW2d 767 (2015).

## A. COMPLETION OF UPGRADES TO 4G

Brian Moccia, DTE's Manager of the AMI Engineering Group in Electric Distribution Operations, provided the following background information:

> Since the completion of the pilot installation in 2008, the Company has been steadily installing meters and modules. As of June 1, 2018, DTE Energy has installed over 2.6 million electric meters . . . .
>
> . . . [W]e are still working to complete the remaining 1,077 installments of AMI electric meters in 2018.
>
> . . . The Company has integrated all of the basic functions of AMI from meter reading, reconnects, disconnects, and outage notifications to theft/tampering investigation. . . . Reconnects and disconnects are being completed over the air and within minutes as opposed to the former manual and field visit requirement.

Moccia further explained that AMI depended on cellular telecommunications networks, and the cellular industry was in the process of migrating from 3G transmission technology to 4G transmission technology. He expected that 3G would be phased out by late 2020, and as a consequence, all AMI "cell relays" (CRs) that depended on 3G would either need to be upgraded or would lose all remote capabilities, effectively destroying the benefits of the AMI program. He testified that DTE had approximately 3,300 3G CRs and 6,000 industrial-customer 3G meters. Thus:

> Without this upgrade, DTE Electric will lose daily communication with approximately 1 million of the 2.6 million DTE Electric residential electric meters and communication to approximately 6,000 industrial meters. These meters will not be remotely accessible which will have a significant negative impact on our ability to bill customers, eliminate our ability to obtain critical power quality and outage data; and remove our ability to remotely connect/disconnect meters after the cellular carriers transition to 4G cellular.

Asked about bypassing 4G and moving directly from 3G to 5G, Moccia replied that "all parties are expecting 4G devices to coexist within 4G and 5G infrastructure," and that "5G products and 5G infrastructure is not readily available."

However, a public utilities engineer from the Smart Grid Section of the Energy Operations Division of the PSC reported that the recommendation of the PSC staff was "to disallow all costs

associated with the additional relays over the 3,000 the Company initially installed as the Company's meter read rate through 2017 was 98.51%." The witness elaborated:

> While Staff understands that generally a higher read rate is better for customers, in this case the Company is well above the Commission[']s Service Quality and Reliability Standard of 85% and the incremental costs required to increase the read rate beyond the 98.51% the Company is already achieving are unnecessary at this time. Due to the diminishing returns that can be achieved with increasing its read rates further, the costs that will be required to further increase the read rates are likely above and beyond the benefits that will be achieved and were not supported in the Company's direct case.

In the end, the PSC explained its decision to deny recovery for the proposed upgrades as follows:

> [T]he Commission . . . adopts the proposed $9.6 million disallowance associated with the 300 additional 4G relays. . . . DTE Electric's meter read rate is high, well above the 85% required by the Commission's Service Quality and Reliability Standards for Electric Distribution Systems, Mich Admin Code, R 460.724(d). The utility has been able to achieve this level of meter reads with 3,000 relays, and the Commission agrees with the Staff that the additional 300 relays are an unnecessary expense. . . . The Commission approves this disallowance. In DTE Electric's last rate case, the Commission expressed concern over the conversion to 4G given the plans of the telecommunications industry to move to 5G and the potential for stranded investments due to technology obsolescence. The Commission stresses the importance for DTE Electric to strategically integrate and sequence its technology enhancements to support grid modernization efforts. With increased digitalization, this attention to technology is essential to avoid unnecessary costs and ensure ratepayer benefits. . . . [*In re Application of DTE Electric Co*, order of the PSC entered May 2, 2019 (Case No. U-20162), pp 34-35 (citation omitted).]

We conclude that the challenged decision was simply a judgment call, and that DTE has failed to show that the PSC abused its discretion in the matter. We recognize that DTE has made a reasonable argument that its customers with 3G would benefit from an upgrade to 4G, and the PSC's witness acknowledged that "a higher read rate is better for customers." However, the PSC's witness also opined that DTE's "read rate" was already very high, and a substantial investment to further increase that rate offered poor value. Further, although DTE's witness reported that equipment for upgrading to 5G was not yet available, DTE's brief on appeal includes no assertion that problems with obtaining 5G equipment make it impractical to shift the 300 customers still at 3G directly to 5G in reasonable time.

For these reasons, DTE fails to show that the decision to disallow recovery of the costs of upgrading 300 additional customers from 3G to 4G was not supported by substantial evidence, or was an abuse of discretion.

B.  AMOUNT OF DISALLOWANCE

DTE argues that the entire project for upgrading 3,300 relays carried a total cost of $34.3 million, and that the 300 relays yet to be upgraded thus constituted approximately 9% of the total proposed, but that the PSC's $9.6 million disallowance was approximately a third of that total cost, thus seriously out of proportion.  DTE insists that the disallowance should have been no more than $2,370,000.

In support of the latter calculation, DTE cites specific data from the record indicating that the total cost of the project was $34.3 million.  We note, however, that $2,370,000 is substantially less than 9% of $34.3 million.  DTE also cites testimony from its Director of Operational Technology in Electric Distribution Operations, Jacqueline Robinson, who testified as follows:

> I provided the cost breakdown of the 3G to 4G project.  I stated that "There are external contracts to provide network engineering design, project management, and overhead line installation of approximately $3.5 million, and DTE labor of approximately $5 million.  The material for the project is the largest contributor of almost $26 million."  The material cost of the project represents a turn key solution with a hardware vendor.  This represents the cost of the hardware, most of the installation labor, and material.  The $26 million divided by 3,300 cellular relays results in a per relay cost of approximately $7,900.  Therefore, even if Staff recommended disallowing adding 300 relays, the disallowance should only be $2,370,000 (300 times $7,900).

It appears that Robinson's $26 million figure omits the $3.5 million in contract labor costs and $5 million in DTE's labor costs.  However, adding those labor costs comes to $34.5 million, only slightly more than the $34.3 million total project cost cited by DTE in its brief on appeal.  Dividing the total including labor costs by 3,300 units results in a per-unit cost of $10,454.5, and at 300 units, the total disallowance amount would be $3,136,365.

The PSC's only explanation for rejecting DTE's proposed amount of disallowance was that its staff's proposed disallowance included the cost of labor while DTE's proposal did not.  As noted, this is technically true: the total disallowance amount including labor costs of $3,136,365 is significantly greater than the $2,370,000 cited by DTE.  However, the PSC instead adopted a disallowance of $9.6 million, which is a vastly greater amount; and, importantly, the PSC provided no explanation in its May 2, 2019, order of why such an amount was appropriate.  Indeed, the PSC's staff admitted, in response to DTE's motion for reconsideration, that the $9.6 million figure was incorrect, stating:

> Staff points to its initial brief for the proper calculation of the disallowance for the 300 additional relays at issue.  Staff's brief provides,
>
>> Staff reasserts that its calculation of its disallowance is correct given the information that the Company provided in the instant case.  Staff used the $6,000 per cell relay shown in CSM-8.7 to calculate that the Company should have $18,000,000 in costs to purchase the cell relays.  Staff then took this number from the $26,000,000 in material

costs shown in Staff's Exhibit S-20, resulting in a disallowance of $8,000,000. In calculating the installation costs, Staff took the Company's proposed installation cost of $5,000,000 and calculated a cost per relay to install totaling $1,515. Staff then took that cost and multiplied it by the 300 cell relays it is recommending for disallowance and found that value to be $454,500. Staff's calculations are based on the information the Company provided in audit response and is the best information that was made available to Staff.

Therefore, Staff maintains that the proper disallowance for this category should be $8,454,500, which is the sum of staff's material cost disallowance and installation cost disallowance. Staff maintains that neither the Company's proposed $2.37 million disallowance calculated in its Petition, nor the $9.6 million disallowance referenced in the May 2, 2019 order are correct.

The PSC's staff thus still arrived at a much greater amount than did DTE, but the staff's recalculation was at least explained. The recalculation also significantly undermined the PSC's reliance on its staff for the $9.6 million figure. The PSC nevertheless denied DTE's motion for reconsideration, stating that its staff "opposes the petition on grounds that the utility's arguments were addressed by the Commission, while advocating for a different disallowance amount which appeared in the Staff's initial brief but not on the record," and that "all of DTE Electric's arguments, including those addressing the disallowance amount, were addressed in the May 2 order." The PSC never provided a substantive explanation for rejecting its staff's reduced calculation or for its $9.6 million disallowance. The PSC has thus failed to show that its figure was supported by substantial evidence on the whole record.

Conversely, DTE asserts that the staff's new figure was "based on an unexplained calculation," but it offers no discussion of the particulars quoted above from the staff's original brief. Thus, DTE has not presented any concrete explanation of why the staff's numbers are unfounded or why the staff's arithmetic is erroneous. We therefore decline to merely adopt DTE's alternative figure. Rather, we hold that the PSC's disallowance of $9.6 million is unsupported, but that the PSC correctly found DTE's alternative proposed amount is also inappropriate. We will not substitute our judgment for that of the PSC by purporting to calculate a more appropriate disallowance amount on our own. See *Attorney General*, 237 Mich App at 88. Instead, we vacate the May 2, 2019, order as to the amount of disallowance for DTE's 4G upgrade to the 300 additional relays, and we remand this case to the PSC with instructions to review the whole record and decide again the amount of the disallowance while providing a reasonably detailed explanation of the basis for it.

## IV. PROJECTED TEST YEAR

RCG argues that the PSC erred by allowing DTE, for purposes of establishing representative levels of revenues, expenses, rate base, and capital structure for use in the rate-setting formula, to designate a projected test year that extended beyond 12 months after it filed this rate case. We disagree.

A "test year" is a utility rate-making conceptual tool that involves selecting a given period of time, usually 12 months, and tallying up all of the utility's costs, assets, expenses, income, entitlement to profit from its rate base, and, broadly, other moneys in and out. Oftentimes, some adjustments will be made to account for particular circumstances or expectations. This adjusted tallying-up will then, in principle, reveal either a revenue deficiency permitting rates to be increased, or a revenue surplus requiring rates to be decreased. In this case, DTE relied on a projected (i.e., anticipated future) test year from May 1, 2019, through April 30, 2020. Also factoring into its calculations was the historical year consisting of the 12 months ending December 31, 2017. MCL 560.6a(1) authorizes a utility to "use projected costs and revenues for a future consecutive 12-month period in developing its requested rates and charges."

RCG argues that MCL 560.6a(1), the statute authorizing the use of test years, does not permit utilities to utilize test years set more than 12 months into the past or 12 months into the future, as measured from the date on which a rate case is filed. RCG's interpretation of the statute is contrary to the statute's plain language. In relevant part, the statute provides as follows:

> A gas utility, electric utility, or steam utility shall not increase its rates and charges or alter, change, or amend any rate or rate schedules, the effect of which will be to increase the cost of services to its customers, without first receiving commission approval as provided in this section. . . . A utility may use projected costs and revenues for a future consecutive 12-month period in developing its requested rates and charges. . . .

There is no dispute that the second quoted sentence above authorizes the use of test years. The plain language of the second quoted sentence, as the PSC found, authorizes the use of test years consisting of "consecutive 12-month periods." In other words, a utility may not utilize a test period consisting of, for example, 11 months or 13 months. Nowhere in the statute is any express or implied constraint upon *when* that 12-month period must be set.

RCG argues that such an interpretation would permit test years to be set too far in the future or in the past to be useful. We agree that no such constraint exists in the statute. However, a utility that selects a test year set too far in the past or future would obviously risk rejection by the PSC, and doing so would likely make adjustments prohibitively difficult. Any adoption by the PSC of such an inappropriate test year would also be subject to appellate challenges for unreasonableness. See MCL 462.26(8); *In re MCI Telecom Complaint*, 460 Mich at 427. Furthermore, even if we agreed with RCG's argument that, in effect, the lack of a constraint on when a utility may set a test year could lead to an absurd result, which we do not, we may not disregard the plain language of the statute. *Taylor v Lansing Bd of Water and Light*, 272 Mich App 200, 207; 725 NW2d 84 (2006). Rather, the "absurd result" rule permits judicial construction to avoid an absurdity only if a statute has already been determined to be ambiguous. *Id*. Even if we were at liberty to depart from the plain language of the statute, we would not do so here, because RCG has failed to show that its concerns have any practical foundation.

RCG argues that its reading of MCL 460.6a(1) is properly based on the plain language of related statutory provisions. Related statutes should be read *in pari materia*, with the goal of harmonizing those statutes in furtherance of their common purpose. *Jennings v Southwood*, 446 Mich 125, 136-137; 521 NW2d 230 (1994). However, "the *in pari materia* doctrine is a rule of

statutory construction that is not implicated if the language of the statute is unambiguous and the legislative intent is clearly expressed." *City of Grand Rapids v Brookstone Capital, LLC*, ___ Mich App ___, ___; ___ NW2d ___ (2020) (Docket No. 350746), slip op at pp 3-4. RCG cites other statutory provisions that impose constraints on when the PSC must issue a final order and on how frequently rate cases may be filed. Neither provision compels the conclusion that the Legislature must have omitted a temporal constraint from MCL 560.6a(1) due to a scrivener's error or otherwise offers a compelling reason why we should consider the plan language of the statute to be in error.

We reject RCG's challenge to the prospective test year adopted in this case.

## V. THE TAX CUTS AND JOBS ACT OF 2017

RCG argues that the PSC failed to properly take into account the reduction in the federal corporate income tax rate occasioned by Tax Cuts and Jobs Act of 2017 (TCJA).[3] We are not persuaded.

In response to the enactment of the TCJA, the PSC commenced Case No. U-18494, generally for the purpose of determining how any savings enjoyed by utilities as a result of the TCJA should be passed on to ratepayers. In relevant part, the PSC adopted a "Credit A," which was a "going-forward tax credit" intended to pass utilities' income-tax savings on to customers as quickly as possible. Credit A was intended to be a temporary measure, implemented on an exceptional basis outside the normal rate-making cycle, and to last only until utilities' rates were updated pursuant to that normal process. Credit A was to be determined on a utility-by-utility basis in contested cases. Credit A went into effect on January 1, 2018. Relevant to this matter, the "Credit A" case involving DTE concluded with the parties' agreement that the forward-looking credit associated with the tax reduction was $156.9 million. The PSC approved the settlement, and approved tariffs implementing that rate reduction effective on August 1, 2018.

In the meantime, however, DTE filed its application in this case on July 7, 2018; in other words, after Credit A went into effect in general, but before Credit A was actually approved and implemented as to DTE. DTE explains that when it filed its application in this case, it "accounted for the TCJA's reduction in the applicable federal income tax rate from 35% to 21% effective January 1, 2018; however, it did not account for the Credit A refund because the Credit A rate reduction had not yet occurred." The PSC agrees that DTE updated its rates for the projected test year to reflect the tax rate reduction, but, "because the Credit A had not yet been approved when DTE filed the present case, the Company did not account for the credit's impact."

DTE's Manager of Revenue Requirements explained that application of the Michigan Business Income Tax, Municipal Income Tax, and Federal Income Tax in 2017 required DTE "to collect $1.6393 in revenue to produce $1.00 of after-tax income." As a consequence of the TCJA's tax reduction, the amount of revenue then needed to produce $1.00 of after-tax income was reduced to $1.3496. In other words, DTE needed to take in less revenue (i.e., less money from ratepayers)

---

[3] See PL 115-97; 131 Stat 2054.

to generate the same amount of income. A Departmental Analyst in the Rates and Tariff Section of the PSC's Regulated Energy Division explained that DTE's Credit A approval decreased DTE's revenues by "approximately $148.2 million." The PSC ultimately authorized DTE to adopt new rates calculated to cover, among other things, "a jurisdictional revenue deficiency of $125,097,000, combined with the expiration of the Tax Cuts and Jobs Act of 2017 Credit A of $148,237,000." *In re Application of DTE Electric Co*, order of the PSC entered May 2, 2019 (Case No. U-20162), p 212. Earlier in that order, the PSC noted that DTE has variously "supported a revised revenue deficiency of $250.2 million . . . and . . . $248.6 million," neither of which "include[d] the rate effect of the expiration of the Tax Cuts and Jobs Act of 2017 Credit A of $148.237 million, authorized in the July 24, 2018 order in Case No. U-20105," the inclusion of which "brings the original request to $476 million." *Id.* at 1 n 1.

RCG expressly agrees that the PSC's order in this case terminated DTE's Credit A reduction, and further that the value of that reduction is $148,237,000. Rather, RCG argues that the federal tax reduction would simultaneously reduce DTE's revenues and expenses by the same amount, and that because the "Credit A Order simply reduced rates to reflect the corresponding reduction in DTE's federal income tax expense," termination of Credit A "should have been totally neutral in terms of rate impact." RCG thus concludes that DTE received a windfall of approximately $148.2 million laundered into its rates. However, we agree with the PSC's explanation of what actually happened: "DTE's initial rate request already took the TCJA's tax reduction into account. The Credit A refund arose after that, so it had to be adjusted back out." In other words, DTE corrected for the effect of the TCJA in its rate application, and the subsequent approval of Credit A resulted in a *double* correction. What RCG appears to regard as a windfall was, in fact, elimination of double-dipping. In other words, the PSC did not increase DTE's rates by $148.2 million, but rather adjusted the rates to reflect that they had already been reduced by that amount. We reject this claim of error.

## VI. ADJUSTMENTS FOR EARLIER VIOLATIONS

RCG argues that the PSC abused its discretion by declining to adjust DTE's rates in this case to include enforcement of an earlier settlement and order. We disagree.

In its brief on appeal, RCG presents a detailed history of earlier proceedings concerning purportedly non-transmitting AMI meters that were in fact sending radio signals, which culminated in a 2018 order of the PSC approving a settlement agreement. The proposal for decision in this case reported as follows:

> On December 20, 2018, the Commission issued an order in Case Nos. U-20084 and U-18486 approving a contested settlement agreement. Among other things, the settlement agreement provides:
>
> > DTE Electric agrees to replace the meters of all electric customers currently electing service under the Company's Non-Transmitting Meter Provision, with digital meters that are not capable of transmitting any signals. DTE Electric will complete the replacement by December 2019, provided that the opt-out customers grant the Company access to facilitate the replacement. Before

-13-

replacing an electric opt out customer's meter, DTE Electric will test the existing meter to determine if the radios are enabled and/or broadcasting. If the on-site tests, or other information available to DTE Electric, indicate that either one of the radios in the opt out customer's meter is still sending a signal, all monthly opt-out fees paid to date by the customer will be refunded including interest per the Billing Rules. No fee will be assessed to the opt-out customer for the meter replacement and DTE Electric will record a one-time credit as Contribution in Aid of Construction in the amount of $750,000 to offset the installation costs of the digital meters. The remaining current customers that do not have an AMI meter, and who elect to take service under DTE Electric's Non-Transmitting Meter Provision will receive digital . . . nontransmitting meters. DTE shall prepare quarterly reports on the progress of the meter replacement.

RCG argued that DTE's rates should be adjusted downward to reflect the costs incurred by DTE to remedy its violations as addressed in the settlement agreement. The ALJ and the PSC both concluded that the settlement agreement was not approved until after the record in this matter had closed, and if DTE's rates should be adjusted as a consequence of the settlement agreement, any such adjustment should be addressed in DTE's next rate case.

RCG notes that the order underlying this case was issued after the settlement order in question, and asserts that the investigation underlying the latter took place at the same time as proceedings in this case, and also that DTE incurred expenses in order to "undertake countless hours of company time to investigate the situation, render refunds to opt-out customers, to formulate reports to the Commission, to litigate issues in U-20084, and to engage in settlement meetings, among a host of other activities." However, RCG neither identifies anything in the record below suggesting that DTE requested that the new rates cover any such expenses, let alone that the PSC authorized such recovery; nor explains why future rate cases will not adequately provide opportunities for appropriate adjustments.

As a result, we reject this claim of error.

VII. SMART PHONE OPT-OUT CHARGES

RCG argues that the PSC erred by continuing to recognize AMI opt-out charges as established in earlier proceedings. Again, we disagree.

Specifically, DTE imposes extra charges on customers who, for a variety of reasons, choose to use electric meters that do not transmit radio signals. See *Stenman*, 311 Mich App at 373-375. RCG cites testimony from DTE's witnesses in which they indicated that the issues relating to the imposition of opt-out charges were not considered or decided anew in this case, and asserts that "[t]he inescapable conclusion is that no adequate cost explanation or evidence has been provided by DTE to justify the unnecessary initial or monthly opt-out surcharges." However, as DTE's witnesses made plain, DTE was not seeking to introduce newly justified opt-out charges, but rather was seeking a continuation of policies as decided in earlier proceedings. The PSC

rejected RCG's argument because RCG failed to present any evidence or arguments that had not already been repeatedly presented, ruled on, and affirmed on appeal.

This Court has noted that "ratemaking is a legislative, rather than a judicial, function, and thus the doctrines of res judicata or collateral estoppel[4] 'cannot apply in the pure sense.' " *In re Application of Consumers Energy Co for Rate Increase*, 291 Mich App 106, 122; 804 NW2d 574 (2010), quoting *Pennwalt Corp v Pub Serv Comm*, 166 Mich App 1, 9; 420 NW2d 156 (1988). This Court further stated, "Even so, issues fully decided in earlier PSC proceedings need not be 'completely relitigated' in later proceedings unless the party wishing to do so establishes by new evidence or a showing of changed circumstances that the earlier result is unreasonable." *In re Application of Consumers Energy*, 291 Mich App at 122, quoting *Pennwalt Corp*, 166 Mich App at 9.

RCG asserts generally that the progress DTE has made in implementing AMI is, standing alone, grounds for revisitation of the opt-out surcharges established at the onset. However, RCG does not cite information from the record to show that any new information reveals continued application of those initial surcharges to be excessive. Further, DTE states in its appellate briefing that, consistent with an earlier PSC order, it "anticipates filing an application to review the opt-out charges in a separate docket after AMI installation is complete." If RCG has suggested that the PSC might reasonably have called for such comprehensive review before completion of the AMI installation, it has nonetheless failed to show that awaiting completion was unreasonable. See MCL 462.26(8). We reject this claim of error.

## VIII. CONCLUSION

For the reasons discussed, we vacate the PSC's order to the extent of the dollar amount of its disallowance of recovery for DTE's 4G upgrade of 300 additional relays, and we remand for the PSC to recalculate the amount of that disallowance and provide a reasonably detailed explanation of its basis for that amount. In all other respects, we affirm. We do not retain jurisdiction.

/s/ Michael J. Kelly
/s/ Amy Ronayne Krause
/s/ James Robert Redford

---

[4] "Under the doctrine of res judicata, 'a final judgment rendered by a court of competent jurisdiction on the merits is conclusive as to the rights of the parties and their privies, and, as to them, constitutes an absolute bar to a subsequent action involving the same claim, demand or cause of action.' " *Wayne Co v Detroit*, 233 Mich App 275, 277; 590 NW2d 619 (1998), quoting *Black's Law Dictionary* (6th ed, 1990), p 1305. "Collateral estoppel bars relitigation of an issue in a new action arising between the same parties or their privies when the earlier proceeding resulted in a valid final judgment and the issue in question was actually and necessarily determined in that prior proceeding." *Leahy v Orion Twp*, 269 Mich App 527, 530; 711 NW2d 438 (2006), citing 1 Restatement Judgments, 2d, § 27, p 250.